**Della BROWN, Conservator of Dan C. Briscoe, A Protected Person, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Della BROWN, Conservator of Dan C. Briscoe, A Protected Person, Appellant,**

v.

**Ronald L. SMITH; Francis L. Winner; Burl M. Johnson; Larry J. Lopez; Daniel A. Devere; Con L. Shultz; Stephen J. Titus; and Thomas S. Morgan, John Siefkes, Gale Shields, Gerald E. Thompson and Richard Britton, Appellees.**

Nos. 83–1234, 83–1242.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1983.

Decided July 20, 1984.

---

Ronald D. Lahners, U.S. Atty., Paul W. Madgett, Asst. U.S. Atty., Omaha, Neb., for the U.S.A., John Siefkes, Gale Shields, Gerald E. Thompson and Richard Britton.

M.J. Bruckner, Marti, Dalton, Bruckner, O'Gara & Keating P.C., Lincoln, Neb., for Winner.

Douglas L. Kluender, Healey, Brown, Wieland, Kluender, Atwood & Jacobs, Lincoln, Neb., for Stephen J. Titus.

Paul L. Douglas, Atty. Gen., J. Kirk Brown, Asst. Atty. Gen., Lincoln, Neb., for Smith, Johnson, Lopez, Devere, Shultz and Morgan.

James A. Eske, Barlow, Johnson, DeMars & Flodman, Lincoln, Neb., for appellant.

Before BRIGHT, JOHN R. GIBSON and FAGG, Circuit Judges.

FAGG, Circuit Judge.

Dan Briscoe claims that he was the victim of a racially motivated hanging incident, a "mock lynching," that occurred while he was participating in National Guard training exercises. Briscoe's mother and conservator, Della Brown, alleges that as a result of this mock lynching, Briscoe entered into a deep mental depression, culminating ·in a suicide attempt in which he was severely and permanently injured. Brown brought an action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, to recover for injuries sustained by Briscoe as a result of the hanging incident. Brown also brought an action against several individuals for the violation of Briscoe's civil rights under 42 U.S.C. §§ 1981 and 1983 and for the violation of Briscoe's federal constitutional rights under the due process and equal protection clauses. The district court granted the defendants' motions for summary judgment in both actions, relying upon the doctrine of military immunity in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

Under the *Feres* doctrine, the United States and its military personnel are not liable for injuries to service members that are incident to their military service. The sole issue in this appeal is whether Briscoe's injury was incident to his military service. After considering the relevant cases of the Supreme Court and this and other circuits, we conclude that Briscoe's claim against the participants in the hang-

ing incident is not barred by the *Feres* doctrine. We also hold that Briscoe's claims against the United States and his superior officers for failing to prevent the incident, and against his superior officers for later failing to perform an adequate investigation of the incident, impinge upon the unique military disciplinary structure and are barred by the *Feres* doctrine.

## I. Background

Dan Briscoe, a black private in the Nebraska Army National Guard, was participating in the federally mandated annual training exercises for guardsmen at Fort Gordon, Georgia. Before the hanging incident, Briscoe was the subject of racial insults, threats, and ridicule by his fellow guardsmen. On one occasion, a miniature hangman's noose, bearing the inscription "KKK," was placed on Briscoe's bunk. On May 31, 1976, while Briscoe was on nonduty status for the Memorial Day holiday, he attended an afternoon party that members of the Nebraska and Mississippi Army National Guard were having. The party took place outdoors, at a location on the military base between the barracks of the Nebraska and Mississippi guardsmen. Briscoe contends that at this party, several members of the Nebraska and Mississippi Army National Guard, who were intoxicated or under the influence of drugs, led Briscoe to believe that he was being taken by a lynch mob. A noose was placed around Briscoe's neck and he claims that he was raised off the ground. Afterwards, Briscoe returned to his barracks where he overturned several beds, and struck at the barracks wall, putting his hand through a glass window.

Following the hanging incident, an investigation was conducted by the National Guard. Captain Richard Stackhouse conducted interviews and took sworn statements from all of the persons involved in the incident. Captain Stackhouse concluded that the mock hanging took place at a party with excessive drinking, that it was a crude, ill-advised prank, but without intent of bodily harm, and that Briscoe participated in the prank voluntarily and re-

mained at the party drinking after the incident. Briscoe initially indicated that he was not interested in making any formal complaint, but he was interested in his pay, his medical benefits, and talking with a race relations officer, all of which received prompt attention.

Brown asserts that after the hanging incident, Briscoe entered a period of deep depression. This continued until January 12, 1977, when Briscoe shot himself in the head, inflicting permanent and severe physical and mental damage to himself. Brown claims that her son's attempted suicide was the direct and proximate result of the hanging incident.

Brown argues that the United States is liable in the tort claims action because its employees, the base commander and his permanent party personnel, were negligent in allowing the hanging incident to occur. With respect to the civil rights action, Brown contends that individual defendants Smith, Lopez, Devere, Shultz, Titus, and Morgan, all noncommissioned officers in Briscoe's military unit, are liable because of their direct participation in the hanging incident. Additionally, Brown contends that various superior officers failed to recognize and correct the racial problems that led to the incident, failed to provide adequate supervision of the National Guard members while on annual training exercises, and purposefully failed to investigate the incident.

## II. The *Feres* Doctrine

The Federal Tort Claims Act of 1946, 28 U.S.C. § 2671 *et seq.*, waived the traditional immunity from suit of the United States in its sovereign capacity. The FTCA provides for federal jurisdiction of claims against the United States for injuries negligently caused by government employees acting within the scope of their employment, if a private person would be liable under the same circumstances. In a series of decisions now known as the *Feres* doctrine, the Supreme Court established a judicially created exception to the waiver of sovereign immunity in the FTCA, holding that the

United States is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to military service. *See United States v. Brown,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954); *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Brooks v. United States,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1948).

Three rationales are generally offered for the *Feres* principle of military immunity: (1) the "distinctly federal" relationship between the United States and its service personnel; (2) the presence of an alternative compensation system; and (3) the fear of disrupting the military disciplinary structure. *See Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 671–72, 97 S.Ct. 2054, 2057–58, 52 L.Ed.2d 665 (1977). Recent court decisions have tended not to emphasize the first two rationales for the *Feres* doctrine.

The first of the *Feres* rationales is premised on the idea that "it would make little sense to have the Government's liability to members of the Armed Services dependent on the fortuity of where the soldier happened to be stationed at the time of the injury." *Stencel Aero Engineering Corp. v. United States, supra,* 431 U.S. at 671, 97 S.Ct. at 2057. As the Ninth Circuit has recently noted, however, "[t]he argument that the military relationship is distinctly federal applies with equal force to other federal agencies that are liable under the FTCA." *Johnson v. United States,* 704 F.2d 1431, 1435 (9th Cir.1983). Thus, this does not appear to be a strong basis for the *Feres* doctrine.

The second *Feres* rationale refers to the Veterans Benefit Act, which establishes, as a substitute for tort liability, a statutory scheme providing pensions for injured servicemen without regard to any negligence on the part of the government. As to the alternative compensation system, another circuit has made the observation that "given the Supreme Court's inconsistent treatment of this factor, it cannot be said that the presence of an alternative compensa-tion system either explains or justifies the *Feres* doctrine; it only makes the effect of the doctrine more palatable." *Hunt v. United States,* 636 F.2d 580, 598 (D.C.Cir. 1980).

The most compelling rationale for the *Feres* doctrine clearly is the potential effect of civil suits on the military disciplinary structure. *See Mondelli v. United States,* 711 F.2d 567, 568–69 n. 5 (3d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984); *Johnson v. United States, supra,* 704 F.2d at 1436; *Scales v. United States,* 685 F.2d 970, 972–73 (5th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1772, 76 L.Ed.2d 344 (1983); *Hunt v. United States, supra,* 636 F.2d at 599. As the Supreme Court has explained:

> The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty, led the Court to read that Act as excluding claims of that character.

*United States v. Brown, supra,* 348 U.S. at 112, 75 S.Ct. at 143. The Court emphasized this factor in its recent opinion, *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). In that opinion, the Court stressed the unique military need for discipline and obedience to orders, not only on the battlefield, but in training as well. *Id.* at 2365. "Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment." *Id.*

Although the *Feres* doctrine has often been criticized, "it is beyond question that it is the law." *Laswell v. Brown,* 683 F.2d 261, 265 (8th Cir.1982). The Supreme Court has recently reaffirmed the validity of the doctrine in *Chappell v. Wallace, supra,* 103 S.Ct. at 2362, and in *Stencel*

*Aero Engineering Corp. v. United States, supra,* 431 U.S. at 666, 97 S.Ct. at 2054. This court has given the *Feres* doctrine "a rather broad construction." *Miller v. United States,* 643 F.2d 481, 491 (8th Cir. 1981) (en banc). Although *Feres* dealt with suits against the United States under the FTCA, the *Feres* doctrine has been extended to immunize military defendants in their individual capacities. *See, e.g., Hass v. United States,* 518 F.2d 1138, 1143 (4th Cir.1975); *Bailey v. DeQuevedo,* 375 F.2d 72, 73–74 (3d Cir.1967). *See also Chappell v. Wallace, supra,* 103 S.Ct. at 2364 (suit against individual military officers); *Feres v. United States, supra,* 340 U.S. at 141, 71 S.Ct. at 157. The *Feres* doctrine is also applicable to members of the National Guard. *Anderson v. United States,* 724 F.2d 608, 610 (8th Cir.1983).

In *Miller v. United States, supra,* 643 F.2d at 481, a serviceman died while working during off-duty hours for a private construction firm building on-base residential housing. Miller's death occurred when an aluminum ladder with which he was working came in contact with an uninsulated electric wire owned and controlled by the United States. Miller sued the United States for various negligent acts, including the failure to de-energize the electric wire. In an *en banc* opinion, this court concluded that "[t]he whole situation arose out of life on a military post" and thus held that the injury was incident to service. *Id.* at 495. The "key point," the court said, was that Miller "was always subject to call for active duty, and that the immediacy of his peculiar and special relationship to his military superiors had not been severed by any such formality as a furlough, leave, or pass." *Id.* at 494. Another consideration in *Miller* was that "the work he was doing, though not under the immediate supervision of his military superiors, was related to the military mission of the base." *Id.*

Importantly, the *en banc* court in *Miller* stated that "[w]e need not and do not hold that every action for injuries sustained by an active duty serviceman while on base is barred by *Feres.*" Instead of adopting such a *per se* rule, the court adopted a flexible approach to the *Feres* doctrine, dependent upon the circumstances in each case:

> [W]e analyze the reasons given for the rule laid down by the Supreme Court in *Feres* and consider whether these reasons apply to the undisputed facts of the instant case. While a *per se* rule * * * has the virtue of easy application, *the better jurisprudential course, in our view, is to examine the facts of each case as they arise and determine whether they fall within the reasons given by the Supreme Court for its conclusion in* Feres.

*Id.* at 493 (emphasis added). Various factors emphasized in the Eighth Circuit decisions, such as whether the service member was subject to duty, whether the injury arose out of life on a military base, and what the service member was actually doing at the time of the injury, must inform the decision of whether the injury was incident to service. Such factors, however, are merely guidelines for determining whether the policy rationales of *Feres* will be fulfilled by the application of the doctrine in the individual case.

III.  Analysis

■   At the outset, we must respond to Brown's argument that regardless of the effect the *Feres* doctrine has on the FTCA claim, it does not apply with respect to the civil rights claim under 42 U.S.C. §§ 1981 and 1983. In *Chappell v. Wallace, supra,* 103 S.Ct. at 2362, the Supreme Court considered a similar question—whether enlisted military personnel could maintain an action to recover damages from superior officers for injuries sustained as a result of violations of constitutional rights in the course of their military service. The Court held that the *Feres* doctrine applied to bar a claim brought directly under the Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In a footnote, the Court noted that it did not decide the issue of whether an action could be maintained under 42 U.S.C. § 1985(3). *Chappell v.*

*Wallace, supra*, 103 S.Ct. at 2368 n. 3. Thus, the Supreme Court in *Chappell* left open the question of whether the *Feres* doctrine applied to an action brought under a federal civil rights statute. We are unable to find, however, a reasoned distinction for the purposes of the *Feres* doctrine between *Bivens*-type actions under the Constitution and actions brought under a federal civil rights statute. We cannot say that the policies supporting the civil rights statutes are any stronger than those supporting constitutional rights; nor can we say that military discipline will be any less affected by a civil rights claim than a constitutional claim. Hence, we reject Brown's argument that the *Feres* doctrine can never be a bar to a suit brought under 42 U.S.C. §§ 1981 and 1983.

Although the Eighth Circuit has given *Feres* a broad construction, we believe that this case presents a unique factual situation that is not directly controlled by any of our previous decisions. The extreme nature of the alleged conduct and its total antipathy to any conceivable military purpose sets this apart from our earlier decisions. Consistent with *Miller*, however, we will employ a flexible analysis to determine whether the facts in this case fall within the reasons given by the Supreme Court for its principle of military immunity in *Feres*. Granting that this court has not developed a comprehensive test to determine whether *Feres* should bar a claim, it will be useful to outline various factors that should usually be considered in determining whether an activity is incident to service. *See Johnson v. United States, supra*, 704 F.2d at 1436–41; *Parker v. United States*, 611 F.2d 1007, 1013–15 (5th Cir.1980). We believe that our analysis can be broken down into two parts: (1) whether there is a relevant relationship between the service member's activity and the military service, and (2) whether military discipline will be impeded if the challenged conduct is litigated in a civil action.

A. Relationship Between Service Member's Activity and Military Service

To determine whether a relevant relationship exists between the service member's activity and the military service, we focus our attention on three factors that our court has considered important: the duty status of the service member, the location of the injury, and the nature of the activity.

1. Duty Status

In previous Eighth Circuit decisions, the duty status of the service member at the time of the injury has been an important consideration in the analysis. *See Miller v. United States, supra*, 643 F.2d at 494. *See also Laswell v. Brown, supra*, 683 F.2d at 261. When the injury occurred in this case, Briscoe was off-duty for Memorial Day weekend, no training activities were planned for the weekend, and Briscoe was free to leave the base if he pleased. Thus, although Briscoe was not on furlough, this is not as strong a case for the application of *Feres* as those in which a service member was merely off-duty for the day. In a meaningful way, Briscoe's status was akin to that of a service member on pass. *See Johnson v. United States, supra*, 704 F.2d at 1438 n. 3. Under the circumstances, this factor is not a strong indicator that military immunity should apply.

2. Location of the Injury

The location of the injury has been considered significant by many courts under the incident to service test. Indeed, one court has observed that it appears "fairly well established" that if the injury occurs on a military base, recovery is automatically barred under *Feres*. *Troglia v. United States*, 602 F.2d 1334, 1337 (9th Cir.1979). Although Eighth Circuit cases have tended toward denying recovery in cases in which the injury occurs on a military base, there is no hard and fast rule to this effect. *See Miller v. United States, supra*, 643 F.2d at 493, 494, 495; *Chambers v. United States*, 357 F.2d 224, 229 (8th Cir.1966). We feel that such a rigid test is in part a "substitute for analysis of

whether the serviceman was injured in an activity incident to his service in the military." *Troglia v. United States, supra,* 602 F.2d at 1338. We believe that the location of the injury, which in this case occurred on a military base, is one of the factors to be considered, but it is not alone dispositive.

### 3. Nature of the Activity

■ If our inquiry is truly to determine whether the policy reasons underlying *Feres* will be fulfilled by the application of military immunity in a particular case, we must examine "what the serviceperson was actually doing at the time of the injury." *See Miller v. United States, supra,* 643 F.2d at 497 (Heaney, J., dissenting). Thus, if we are to adhere "to the line drawn in the *Feres* case between injuries that did and injuries that did not arise out of or in the course of military duty," *United States v. Brown, supra,* 348 U.S. at 113, 75 S.Ct. at 143, we must consider whether the activity out of which the action arose served some military purpose or mission. *See Johnson v. United States, supra,* 704 F.2d at 1439; *Miller v. United States, supra,* 643 F.2d at 494; *Parker v. United States, supra,* 611 F.2d at 1014. The activity in this case—a racially tinged mock hanging of a fellow soldier—served no conceivable or remote military purpose.

### 4. Conclusion

In most cases, these three factors will determine whether there is a relevant relationship between the service member's activity at the time of the injury and the military service. However, we observe that there is a special category of cases in which the *Feres* rule has been applied because the service members, at the time of the injury, were enjoying a benefit because of their status as military personnel. *See Johnson v. United States, supra,* 704 F.2d at 1438. Frequently, the benefit is of a recreational nature such as in *Chambers v. United States, supra,* 357 F.2d at 224, in which a serviceman injured while swimming in an on-base pool was denied relief.

Also in this category are suits by service members for medical malpractice, which have generally been barred. *See Feres v. United States, supra,* 340 U.S. at 135, 71 S.Ct. at 153; *Alexander v. United States,* 500 F.2d 1 (8th Cir.1974), *cert. denied,* 419 U.S. 1107, 95 S.Ct. 779, 42 L.Ed.2d 803 (1975). In this case, Briscoe was not at the time of his injury enjoying any benefit peculiar to his status as a member of the military.

Considering the totality of circumstances in this case, we cannot conclude that there is the necessary relevant relationship between Briscoe's activity at the time of the injury and his military service. Briscoe was injured at a drinking party on a long holiday weekend on which he and the other participants in the incident were free to come and go as they pleased. The activity was not sponsored by the military base nor was it related to the military mission of the base or the National Guard. The mock lynching that occurred bore no relationship to any military purpose; rather, it struck a blow at the desired harmonious relations among the members of the military. Thus, we must now consider whether military discipline will be impeded if the challenged conduct is litigated in these lawsuits.

### B. Effect on Military Discipline

As we have already observed, the preservation of military discipline is at the heart of the *Feres* doctrine. Courts have repeatedly recognized the importance of "[t]he peculiar and special relationship of the soldier to his superiors." *See United States v. Brown, supra,* 348 U.S. at 112, 75 S.Ct. at 143. *See also United States v. Carroll,* 369 F.2d 618, 621 (8th Cir.1966). The Supreme Court has recently observed that "the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel, would be undermined" if military officers are exposed "to personal liability at the hands of those they are charged to command." *Chappell v. Wallace, supra,* 103 S.Ct. at 2367. The deference of courts to military judgment is based on the concern

that "[m]ilitary decisionmakers might not be willing to act as quickly and forcefully as is necessary, especially during battlefield conditions, if they know they will subsequently be called into a civilian court to answer for their actions." *Jaffee v. United States,* 663 F.2d 1226, 1232 (3d Cir.1981).

In this case, the claims against the various defendants can be placed in three categories: (1) the failure to prevent the hanging incident, (2) the actual participation by certain defendants in the hanging incident, and (3) the failure to perform a proper investigation of the incident. We believe that if the first and third of these claims were litigated, there would be a damaging effect on the military disciplinary structure.

■ The claim that various officers negligently failed to prevent the incident directly calls into question the disciplinary decisions of Briscoe's superior officers. Presumably what would be litigated is whether the officers should have issued some type of order, or otherwise taken disciplinary action, to prevent any type of racially motivated actions. Under the *Feres* doctrine such a lawsuit cannot be maintained—it strikes precisely at the type of command relationship between a service member and his or her superior officers that is at the heart of the military disciplinary structure. Similarly, the claim that various officers failed to perform a proper investigation strikes directly at military decisionmaking with respect to a disciplinary matter. The *Feres* doctrine will not permit a court to second-guess the military decisions as to how an investigation into a disciplinary matter should have been conducted. *See Miller v. United States, supra,* 643 F.2d at 494.

■ We must next consider the claim against the participants in the hanging incident under 42 U.S.C. §§ 1981 and 1983. Unlike the other two claims, this claim does not involve the command relationship between a service member and his or her superiors, nor does it involve military decisionmaking with respect to disciplinary matters. There is no indication that a su-

perior officer ordered anyone to participate in this offensive incident, so the concern for immediate compliance with military orders and procedures is not implicated. The activity that is at issue in this claim is of a distinctly non-military nature: the alleged participation of a group of men at a holiday weekend drinking party in the mock lynching of a young black man. The primary purpose of the *Feres* doctrine—the maintenance of the military disciplinary structure—could hardly be furthered by the application of military immunity for the participants in this incident. Indeed, the application of the *Feres* doctrine in a case such as this would insulate from liability the very breakdown of military discipline. Thus, the defendants who participated in the hanging incident are not entitled to a dismissal of this lawsuit under the *Feres* doctrine.

Finally, we observe that it is unclear to what extent the Nebraska guardsmen actually participated in the hanging incident. Briscoe's own statements suggest that it was only the Mississippi guardsmen, not the Nebraska guardsmen, who participated in the incident. The Mississippi guardsmen are not defendants in this suit. Additionally, the unanswered affidavits of the Nebraska guardsmen deny that they participated in the incident, other than as bystanders. In any event, this is a matter that seems ripe for consideration by the district court on remand.

In conclusion, then, we find that Briscoe's claim against the participants in the affair is not barred by the *Feres* doctrine. We find, however, that Briscoe's claims against the United States and his superior officers for failing to prevent the incident, and against his superior officers for failing to perform a proper investigation, are barred by the *Feres* doctrine. Thus, the judgment of the district court granting summary judgment in favor of those alleged to have participated in the incident— Smith, Lopez, Devere, Shultz, Titus, and Morgan—is reversed and remanded for further proceedings consistent with this opinion. The judgment of the district court

granting summary judgment in favor of all the other defendants is affirmed.