**Betty WADE and Husband, David Wade, Plaintiffs–Appellees,**

v.

**Bruce GILL, Defendant–Appellant.**

Supreme Court of Tennessee, at Nashville.

Nov. 21, 1994.

Phillip W. Kendrick, Kendrick & Kendrick, Brentwood, for plaintiffs-appellees.

James M. Doran, Jr., Kenneth A. Weber, Manier, Herod, Hollabaugh & Smith, Nashville, for defendant-appellant.

### *OPINION*

DROWOTA, Justice.

The defendant, Bruce Gill, appeals from the Court of Appeals' reversal of the summary judgment granted by the trial court in his favor. The sole issue for our determination is whether the plaintiffs' action is barred by the doctrine of intra-military immunity derived from *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) and its

progeny. We hold that it is, and therefore reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court.

### FACTS AND PROCEDURAL HISTORY

The plaintiff Betty Wade and the defendant Bruce Gill are members of the United States Army Reserve; she holds the rank of staff sergeant and he of lieutenant colonel. At all times relevant to this case, both parties worked at the 3290th United States Army Reserve Finance School in Nashville, and Gill served as Wade's supervisor. On October 9, 1991, while in the course and scope of her duties at the school, Wade began looking for a military manual and assumed a kneeling or stooped position. At some point she made a joking reference to Gill, who thereupon turned to another reservist and stated something to the effect of "please be a witness to the fact that I am abusing my employees." Gill then either touched or kicked Wade in the posterior with his foot.

Because of this incident, Wade filed a claim for medical benefits pursuant to the Veterans Benefits Act, 38 U.S.C. § 301 et. seq. Since benefits under the Act are available only for injuries incurred in the line of duty, Wade contended that her injuries had been received while she was discharging her military duties. After Lieutenant Colonel William McClanahan investigated the incident and ratified that contention, Wade received the statutory benefits.

Wade subsequently brought a tort action against Gill in his individual capacity, alleging that his act constituted a battery that caused her severe physical and psychological harm. Gill then moved for summary judgment, arguing that because Wade received the injuries in the line and scope of her duty, the action was barred by the doctrine of intra-military immunity derived from *Feres*. The trial judge agreed and granted Gill's motion for summary judgment, stating in her order: "the Court finds that the plaintiff's injuries occurred while she was in the line of duty with the United States military and that

defendant was a fellow serviceman and superior officer, and that defendant's motion is well taken and should be granted." Wade appealed to the Court of Appeals from this judgment.

The Court of Appeals reversed the trial court's judgment and remanded the case for a trial on the merits. In its analysis, the Court focussed exclusively on the non-military nature of the defendant's act. It held that because the act of kicking or touching the plaintiff in the posterior did not further any conceivable military mission or purpose, the doctrine of intra-military immunity could not serve to shield the defendant from the civil lawsuit. Gill then filed an application for permission to appeal pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure. We granted the application to address this novel issue of public policy.

### ANALYSIS

In *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), the United States Supreme Court held that the federal government was not liable under the Federal Tort Claims Act [FTCA], 28 U.S.C. § 1346(b), 2671 et seq., "for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. at 146, 71 S.Ct. at 159. Although it was not altogether clear why these claims did not fall within the FTCA when the language of the Act did not specifically exclude such claims, the Court later explained that:

> ... in the last analysis, *Feres* seems best explained by the 'peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty.'

*United States v. Muniz,* 374 U.S. 150, 162, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963) (quoting *United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954)).[1]

---

1. *See also United States v. Shearer,* 473 U.S. 52, 59, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38 (1985) (suits against service members for injuries that were incurred incident to military service

"would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.")

Because civil suits by members of the armed forces against fellow members in their individual capacities have been considered by courts to be as detrimental to the internal disciplinary structure of the military as suits against the government itself, the doctrine enunciated in *Feres,* which was grounded in principles of sóvereign immunity, has been extended to prohibit suits against individual defendants. *See Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Lutz v. Secretary of the Air Force,* 944 F.2d 1477 (9th Cir.1991); *Grant v. Pitchford,* 565 F.Supp. 430 (S.D.Cal. 1983). Therefore, the applicability of the "intra-military immunity doctrine," like the original *Feres* doctrine, depends upon whether the injuries were incurred in "the course of activity incident to service."[2]

Although courts have formulated slightly different tests for answering this question since *Feres* was decided, the more complete analyses have typically emphasized these three factors: (1) the plaintiff's duty status at the time of the act or omission causing the injury; (2) the location where the act or omission took place; and (3) the nature of the plaintiff's activities at the time of the act or omission. *See Johnson v. United States,* 704 F.2d 1431, 1436–1440 (9th Cir. 1983); *Parker v. United States,* 611 F.2d 1007, 1013–1015 (5th Cir.1980); *Miller v. United States,* 643 F.2d 481, 490–95 (8th Cir.1981) (on rehearing en banc). While all three factors certainly shed light on the question, the third factor is probably more important than the other two.

The application of this analysis to the facts of the case before us yields a seemingly clear result. It is undisputed that Wade was on duty at the time of the allegedly tortious act; it is also undisputed that the act was committed at a school owned and operated by the United States Army Reserve. Moreover, it is clear that she was performing activities in the line and scope of her military duty at the time of the act. This conclusion is supported by the fact that Wade was awarded benefits under the Veteran's Benefit Act, which requires that the applicant be performing activities in the line and scope of duty to be eligible for the benefits. Therefore, according to the "activity incident to service test" enunciated above, it appears that Wade's action is barred by the doctrine of intra-military immunity.

The Court of Appeals, however, did not reach this result because it concluded that the *defendant's* act was of a non-military nature. In so doing, the Court relied heavily upon two cases—*Brown v. United States,* 739 F.2d 362 (8th Cir.1984) and *Durant v. Neneman,* 884 F.2d 1350 (10th Cir.1989). Therefore, we must examine these cases in some detail to determine the validity of the Court of Appeals' analysis.

In *Brown* a member of the Nebraska Army National guard, Private Dan Briscoe, was participating in training exercises for guardsmen at Fort Gordon, Georgia. While on non-duty status, Briscoe attended a Memorial Day afternoon party held on the military base. At the party, several intoxicated guardsmen led Briscoe to believe that he was going to be lynched; allegedly they placed a noose around his neck and raised him off the ground. Afterwards, the National Guard conducted an investigation into the incident. The officer in charge of the investigation, Captain Richard Stackhouse, determined that although the incident was "crude and ill-advised," it had not been undertaken with the intention of physically harming Briscoe. Allegedly as a result of this incident, Briscoe became extremely depressed, and this depression culminated in a suicide attempt which left him with permanent physical and mental injuries.

Brown's mother subsequently brought an action in federal district court against the United States under the FTCA and the individual participants in the incident under 42 U.S.C. § 1981 and 1983. She specifically alleged that the United States was liable because: (1) the base commander was negligent in allowing the incident to occur; and (2) the investigation of the incident was negli-

---

2. The intra-military immunity doctrine has also been extended to prohibit suits for intentional torts. *See e.g., Stubbs v. United States,* 744 F.2d 58 (8th Cir.1984); *Jaffee v. United States,* 663 F.2d 1226, 1234–35 (3d Cir.1981).

gently performed. Moreover, she alleged that the individual defendants were liable because of their direct participation in the incident. The district court granted a summary judgment in favor of all defendants and dismissed the case.

The Eighth Circuit reversed the district court's decision as to the individual defendants. In so holding, the Court utilized an analytical framework composed of two sub-issues. The first sub-issue was characterized by the Court as "whether there is a relevant relationship between the service member's activity and the military service." *Brown*, 739 F.2d at 367. In answering this question, the Court applied the factors in the traditional "activity incident to service" test set forth above. It noted that Briscoe was off-duty at the time of the incident; but it noted that the incident took place on the military base. Because the application of these factors pointed in different directions, the Court concentrated on the third factor—the nature of the plaintiff's activity. As to this factor, the Court stated as follows:

> If our inquiry is truly to determine whether the policy reasons underlying *Feres* will be fulfilled by the application of military immunity in a particular case, we must examine 'what the serviceperson was doing at the time of the injury.' Thus, if we are to adhere 'to the line drawn in the *Feres* case between injuries that did and injuries that did not arise out of or in the course of military duty,' we must consider whether the activity out of which the action arose served some military purpose or mission. The activity in this case—a racially tinged mock hanging of a fellow soldier—served no conceivable or remote military purpose.

*Brown*, 739 F.2d at 368 [citations omitted].

Having determined that the nature of the plaintiff's activity—attending a drinking party on a military base—furthered no conceivable military purpose, the *Brown* court proceeded to the second sub-issue in its analysis—"whether military discipline will be impeded if the challenged conduct is litigated in a civil action." *Brown*, 739 F.2d at 367. Here the Court noted that the claim against the United States for negligent failure to supervise "directly calls into question the

disciplinary decisions of Briscoe's superior officers," *Brown*, 739 F.2d at 369; and that the claim for negligent investigation "strikes directly at military decisionmaking with respect to a disciplinary matter." *Id.* This, the Court reasoned, was unacceptable because it exposed the military to the very danger that *Feres* was designed to prevent—the intrusion by civilian courts into sensitive matters of military discipline and decisionmaking.

The Court went on, however, to distinguish the claim against the individual participants from the claims against the United States by stating that:

> Unlike the other two claims, [the individual] claim does not involve the command relationship between a service member and his or her superiors, nor does it involve military decisionmaking with respect to disciplinary matters. There is no indication that a superior officer ordered anyone to participate in this offensive incident, so that the concern for immediate compliance with military orders and procedures is not implicated. *The activity that is at issue in this claim is of a distinctly nonmilitary nature: the alleged participation of a group of men at a holiday drinking party in the mock lynching of a young black man.* The primary purpose of the *Feres* doctrine—the maintenance of the military discipline structure—could hardly be furthered by the application of military immunity for the participants in this incident. Indeed, the application of the *Feres* doctrine in a case such as this would insulate from liability the very breakdown of military discipline. Thus, the defendants who participated in the hanging incident are not entitled to a dismissal of this lawsuit under the *Feres* doctrine.

*Id.* (emphasis added).

In the other case relied upon by the Court of Appeals, *Durant v. Neneman*, 884 F.2d 1350 (10th Cir.1989), the Tenth Circuit considered wrongful death and personal injury claims brought against a serviceman who, while driving to his duty station in his private automobile, struck two other servicemen as they were participating in physical training exercises on a military base. In reversing

the summary judgment granted by the district court in favor of the defendant, the Court relied upon *Brown*, stating as follows:

> We find most helpful the reasoning of the eighth circuit in *Brown*. *In deciding whether intra-military immunity would be granted to certain defendants, the court focussed on the nature of the defendants' conduct.*
>
> . . . . .
>
> While civilian courts have a legitimate concern for protecting the harmony of the military establishment to prevent an erosion of discipline, we do not believe this concern should be extended to claims that arise outside the military function. When a soldier commits an act that would, in civilian life, make him liable to another, he should not be allowed to escape responsibility for his act just because those involved were wearing military uniforms at the time of the act. When military personnel are engaged in distinctly nonmilitary acts, they are acting, in effect, as civilians and should be subject to civil authority ...
> The issue thus devolves into whether the act of driving to his duty station was a military act. We think not. If one were to view this question as synonymous with whether the act of driving was 'incident to military service,' the answer would have to be different. Indeed, it is hard, if not impossible, to decide at what point actions leading to the performance of a military task are not incidental to that end. Yet, if one focusses on the military purpose or mission of the defendant's conduct precipitating plaintiff's claim in the context of a need to protect military integrity, harmony, or authority, one must decide the mere act of driving to work, without more, is not the performance of a military act.

*Durant,* 884 F.2d at 1353–54 (emphasis added).

 Although it contains much of the same terminology, the approach formulated by the *Brown* court (and applied by the *Durant* court), differs substantially from the traditional approach, exemplified by such decisions as *Johnson* and *Parker*. While both approaches are grounded in the need to shield sensitive matters of military discipline and decisionmaking from interference by civilian courts, the traditional approach uses the "activity incident to service" test to determine whether a particular lawsuit impinges upon these concerns. Therefore, in these cases the issue of whether the judiciary should abstain from inquiring into a tortious act or omission occurring in a military context is dependent upon the extent to which *the plaintiff, at the time of the act or omission, was involved in military life.* Thus, if the plaintiff was on duty, if injured on property owned by the military, and if engaged in activity having some legitimate military purpose, courts utilizing the traditional method assume that the plaintiff was so enmeshed in the "military establishment" that they should abstain from inquiring into the act or omission.

Although the *Brown* analysis retains the traditional "activity incident to service" test as a preliminary inquiry, it rejects this fundamental assumption. Instead, it seeks to determine if the purpose of the intra-military immunity doctrine is threatened in a particular case by analyzing whether the civil litigation will *actually* call into question sensitive issues of military discipline and decisionmaking. *Because this approach requires a showing of an actual interference with these matters before immunity will be granted, the court must inquire into the nature of the activities of the defendant as well as the plaintiff.*

The *Brown* approach, though a minority view[3], is not inherently unreasonable. By requiring that the litigation actually interfere with matters of military discipline and decisionmaking, instead of merely presuming such an interference after applying a list of factors that focusses solely on the plaintiff, the *Brown* analysis appears to sharpen the inquiry and to restrict the availability of the intra-military immunity doctrine to cases in which it is truly justifiable. Moreover, be-

---

**3.** Our research has revealed only one other case, *Kenneally v. Bayer*, 760 F.Supp. 503 (D.Md. 1990), that has focussed exclusively on the nature of the defendant's conduct to ascertain whether the litigation will actually impinge upon the internal military disciplinary structure.

cause the approach focusses directly on the ultimate objective of the intra-military immunity, it appears to be more capable of achieving equitable results in anomalous cases than does the traditional "activity incident to service" test.

Notwithstanding these advantages, the *Brown* approach has two serious flaws, one of which was pointed out by the United States Supreme Court in *United States v. Stanley*, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987). In *Stanley* the plaintiff brought an action pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), against military and civilian personnel for injuries he sustained after the defendants allegedly administered LSD to him without his consent as part of a military experiment. Although Stanley recognized that the Supreme Court's holding in *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), forbade *Bivens* actions by servicemen against their superior officers, he argued that *Chappell* was inapplicable to his situation because the defendants were not his superior officers, and therefore the concerns of discipline and decisionmaking that were stressed in *Chappell* were absent from his case. In essence, Stanley argued that because the litigation did not actually interfere with matters of military discipline and decisionmaking, the intra-military immunity doctrine should not apply to his case.

A majority of the Supreme Court rejected Stanley's argument, reasoning as follows:

> ... Stanley underestimates the degree of disruption that would be caused by the rule he proposes. *A test for liability that depends on the extent to which particular suits would call into question military discipline and decisionmaking would itself require judicial inquiry into, and hence intrusion upon, military matters.* Whether a case implicates those concerns would often be problematic, raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands. Even putting aside the risk of erroneous judicial conclusions (which would becloud military decisionmaking), the mere process of arriving at correct conclusions would disrupt the military regime. The "incident to service" test, by contrast, provides a line that is relatively clear and that can be discerned with less extensive inquiry into military matters.

*Stanley*, 483 U.S. at 682–83, 107 S.Ct. at 3063 (emphasis added).

We agree with the reasoning of the *Stanley* court. If we were to adopt the *Brown* approach, the issue of immunity (which would presumably be raised in virtually every case involving members of the military) would depend on the litigation's actual level of interference in matters of military discipline and decisionmaking. Because this determination could not be made as a matter of law in every case, and would likely be vigorously contested in some cases, the test itself would impermissibly draw the judiciary into internal military matters. We, like the Supreme Court, believe that the use of the "activity incident to service" test would avoid most of these difficulties. *See also Lutz v. Secretary of the Air Force*, 944 F.2d 1477, 1487 (9th Cir.1991) ("where ... the process of disentangling conduct not incident to service from that incident to service would itself work an impermissible intrusion upon military matters, *Feres* must be applied to the whole course of conduct").

In addition to its analytical problems, we also believe that the *Brown* analysis is flawed on another ground—that of public policy. Courts have traditionally been very reluctant to become involved in the internal affairs of the military, *see e.g., United States v. Johnson*, 481 U.S. 681, 692, 107 S.Ct. 2063, 2069–70, 95 L.Ed.2d 648 (1987) (extending *Feres* to bar recovery by serviceman for injuries caused by *civilians* in a military context), and for very good reason. The judiciary is particularly unqualified to assess the propriety of actions which, if taken in the civilian arena, would be unreasonable or even criminal. Because the military is undoubtedly a "specialized society," *Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974), which has its own judicial system equipped to deal with the different standards of conduct that obtain in that arena, we believe that the broad "activity incident to

service" test is a better vehicle than the *Brown* analysis to determine which cases should be left to that system for resolution.

Because we cannot accept the *Brown* formulation relied upon by the Court of Appeals, and because Wade's injuries were clearly incurred in the course of "activity incident to service," the judgment of the Court of Appeals is reversed, and the judgment of the trial court is reinstated.

ANDERSON, C.J., REID and BIRCH, JJ., and O'BRIEN, Special Justice, concur.