**Gene A. WILLIAMS, Appellant,**

v.

**SECRETARY OF the NAVY, Appellee.**

**Appeal No. 85–2690.**

United States Court of Appeals,
Federal Circuit.

March 18, 1986.

Edward F. Halloran, Virginia Beach, Va., argued for appellant.

Jay S. Bybee, Dept. of Justice, of Washington, D.C., argued for appellee. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., Elsie J. Munsell, U.S. Atty. and Anthony J. Steinmeyer.

Before MARKEY, Chief Judge, BALDWIN and NIES, Circuit Judges.

MARKEY, Chief Judge.

Gene A. Williams (Williams) appeals from an order of the United States District Court for the Eastern District of Virginia dismissing his complaint for failure to show (1) a deprivation of due process at his court-martial for drug abuse, and (2) damages. We remand with instructions to vacate the judgment.

## BACKGROUND

### (a) Congressional Concerns

Congress has long been concerned with the use of drugs in the armed forces. In 1971, it described drug abuse as "a profoundly serious national problem that is having a grave effect on the Armed Forces." Conf.Rep. No. 433, 92d Cong., 1st Sess., *reprinted at* 1971 U.S.Code Cong. & Ad.News 1495, 1505. In 1978, the House Select Committee on Narcotics Abuse and Control found that "[d]rug abuse constitutes a significant drain upon the military in both human and monetary terms" and found a need for an investigation into "the effect of drug abuse on combat readiness." *Drug Abuse in the Armed Forces*, 95th Cong., 2d Sess. 26 (1978). Numerous hearings have been held and re-

ports issued on drug abuse problems facing the military.[1] Most recently, the House Select Committee concluded study missions to Hawaii, Asia, and Italy, during which it heard testimony that drug abuse impairs productivity, health, safety, and military readiness. The Committee Report specifically noted a Department of Defense study attributing a May 1981 jet crash aboard the U.S.S. NIMITZ to use of illegal drugs by the pilot and crew. *See International Narcotics Control Study Missions to Latin America and Jamaica, Hawaii, Hong Kong, Thailand, Burma, Pakistan, Turkey, and Italy*, H.R.Rep. No. 951, 98th Cong., 2d Sess. 196–97 (1984).

In an effort to reverse the debilitating effects of drug and alcohol abuse in the military, Congress enacted legislation directing the Secretary of Defense to provide means for identifying, treating, and rehabilitating drug and alcohol dependent members of the armed forces. 10 U.S.C. § 1090 (1982) (formerly Pub.L. 92–129, Title V, § 501, 85 Stat. 361, *repealed by* Pub.L. 97–295, § 6(b), 96 Stat. 1314). Department of Defense (DOD) and the Department of the Navy (Navy) issued instructions under this directive, two of which are particularly relevant here: (1) Secretary of the Navy Instructions (SECNAVINST) 5300.28 (June 12, 1981), and (2) Chief of Naval Operations Instructions (OPNAVINST) 5350.4 (November 29, 1982).

SECNAVINST 5300.28 stated that use of drugs "in any amount" was "incompatible with the maintenance of high standards of performance, military discipline, readiness and reliable mission accomplishment." It emphasized that "[f]ailure to identify drug abusers ... can cost the lives of abusers, interferes with reliable mission accomplishment, and can cost the lives of military and civilian personnel." It further provided

that identification of drug abusers was essential if drug abuse among Navy personnel was to be eliminated, and authorized commanding officers to "make fullest use of administrative and punitive procedures" to control alcohol and drug abuse.

Under SECNAVINST 5300.28, commanders were encouraged to use a number of measures—including inspections, trained dogs, and urinalysis—to detect drug use. In particular, the Secretary stated that commanders should make "judicious use" of command-directed unit urinalysis where there was reason to suspect drug use, especially in high-use areas. He noted, however, that under then-existing DOD regulations the results of the urinalysis could not be used for disciplinary purposes.

In September 1981, at hearings before a House Select Committee, outraged Members of Congress stated that the results of a recent fact-finding mission and survey of U.S. military personnel revealed "a shocking level of drug abuse" within the military. *Drug Abuse in the Military—1981 Hearing Before the Select Committee on Narcotics Abuse and Control*, 97th Cong., 1st Sess. 2 (1981) (Statement of Representative Leo Zeferetti). Members of the Select Committee found that "critical national security issues" were at stake, that because of severe drug abuse, the military could no longer ensure the combat readiness of its troops, and that the United States was faced with "a real and present danger to its security." *Id.* at 5 (Statement of Representative Benjamin Gilman).

To meet Congress' concern that alcohol and drug abuse be detected and eliminated from the Armed Services, Army and Navy representatives assured the Select Committee that new initiatives were being taken: (1) improved testing procedures, including

---

1. *See, e.g.,* S.Rep. No. 53, 98th Cong. 1st Sess. (1983); *Drug and Alcohol Abuse in the Armed Services*, 97th Cong., 2d Sess. (1982); *Drug Abuse in the Military—1981 Hearing Before the Select Committee on Narcotics Abuse and Control*, 97th Cong., 1st Sess. (1981); *Drug Abuse in the Armed Forces of the United States: An Oversight Update*, 96th Cong., 2d Sess. (1980); *Drug and Alcohol Abuse Among Army U.S. Military Personnel and Dependents in Germany*, 92d Cong., 2d Sess. (1972); *Military Drug Abuse, 1971*, 92d Cong., 1st Sess. (1971); *Drug Abuse in the Military*, 92d Cong., 1st Sess. (1971); *Inquiry Into Alleged Drug Abuse in the Armed Forces*, 91st Cong., 2d Sess. (1971); *Alleged Drug Abuse in the Armed Services*, 91st Cong., 2d Sess. (1971).

urinalysis, to detect the presence of drugs such as marijuana; and (2) lifting of internal restrictions on the use of urinalysis results for disciplinary purposes. *Id.* at 36–38 (Statement of Brigadier General William Louisell); 173–74 (Statement of Rear Admiral Paul Mulloy).

Following those hearings, Navy issued three drug abuse program directives between December 1981 and February 1982. On December 23, 1981, the Chief of Naval Operations issued NAVOP 172/81, in which he stated that drug abuse would not be tolerated in the Navy at any time: "[T]he illegal use of drugs, including marijuana, adversely impacts on the physical and psychological health of an individual ... [who] becomes an unacceptable risk to the safety of his/her shipmates." Strict guidelines were adopted for dealing with drug abusers, including trial by court-martial for anyone thrice identified as a user of drugs.

NAVOP 178/81, issued December 29, 1981, announced changes in urinalysis technology enabling Navy to expand its drug abuse urinalysis program. It authorized the use of command directed urinalysis (i.e., on less than probable cause) for administrative separation purposes, but not for disciplinary purposes.

Finally, on February 4, 1982, the Secretary of the Navy issued an Interim Change to SECNAVINST 5300.28. Adopting a DOD policy, the directive for the first time permitted disciplinary action and administrative separations for, *inter alia*, any evidence of drug abuse obtained through a unit sweep urinalysis.

The Secretary cancelled NAVOP 172/81 and NAVOP 178/81 on November 29, 1982, replacing them with Chief of Naval Operations Instructions (OPNAVINST) 5350.4. Declaring a policy of "Zero Tolerance" for drug or alcohol abuse, OPNAVINST 5350.4 provided comprehensive guidelines for a unified Navy Alcohol and Drug Abuse Program. It further provided that urinalysis

was the major means of detecting drug abuse at the unit level. All active duty personnel would be subject to urinalysis on an inspection basis, either as part of a random sampling or in a unit sweep.[2] While commanders were not to conduct inspections for the primary purpose of obtaining evidence, any evidence obtained could be used in disciplinary or separation proceedings.

The policy announced in OPNAVINST 5350.4 was confirmed in DOD Directive No. 1010.1 (March 16, 1983), directing use of the testing program to "[p]ermit commanders to assess the security, military fitness, and good order and discipline of their commands and to take appropriate action based upon such an assessment." It further provided that mandatory urinalysis testing could be conducted during inspections performed under Military Rule of Evidence 313. Use of urinalysis results was permitted under the Directive unless otherwise limited by the Military Rules of Evidence, the Directive, or other rules of the Department of Defense or any military department.

### (b) Williams' Arrest and Court-Martial

Williams was a Chief Boiler Technician assigned to the Navy's Mobile Diving and Salvage Unit Two, Naval Amphibious Base at Little Creek, Virginia. (App. at 490). On March 22, 1983, the Commanding Officer of his unit, in accordance with Navy regulations, conducted a unit sweep urinalysis. The samples obtained were tested by the Navy Drug Screening Laboratory in Portsmouth, Virginia using radioimmunoassay, gas liquid chromotagraphy (GLC) and gas liquid chromatography/mass spectrometry ("GC/MS") tests. (The GC/MS test is generally considered the most accurate test available to the scientific community.) Williams tested positive for tetrahydrocannabinol ("THC"), a metabolite indi-

---

**2.** The unit sweep was to be conducted as an inspection pursuant to Military Rule of Evidence 313, which provides that evidence obtained during an inspection—defined as an examination of a unit to determine its military fitness, good order, and discipline—is admissible at trial.

cating the presence of marijuana in his system.

On April 18, 1983, the Navy charged Williams with violating Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934 (1982). The charge stated that he did:

in the vicinity of Hampton Roads, Virginia, while not on a period of extended leave did, on or about March 15, 1983 to March 22, 1983, knowingly and wrongfully use Marijuana, a Schedule I Controlled Substance.

Williams was tried by Special Court-Martial,[3] and was convicted of the charge on June 10, 1983. He was sentenced to be "reduced in paygrade from E–7 to E–5, to perform hard labor for sixty days without confinement, to be restricted to the limits of his ship or station for a period of sixty days ..." (App. at 492–3, Stipulation ¶ 10). When the sentence was approved, his reduction from paygrade E–7 was changed to E–6. Because he was relieved of all diving duties, Williams was no longer eligible for diving proficiency pay. Processing of Williams' Administrative Discharge began on July 25, 1983. His punishment took effect on July 29, 1983. Williams was separated from the Navy on October 31, 1983 with a General Discharge under honorable conditions. At no time between his conviction on June 10 and his discharge on October 31 did Williams appeal his court-martial to the Judge Advocate General, nor did he seek relief from the Board for Correction of Naval Records.

### (c) Suit in District Court

On June 27, 1983, seventeen days after Williams' conviction, twenty-eight days before his processing for discharge had begun, and thirty-three days before his punishment became effective, suit was filed in the Eastern District of Virginia[4] for a writ of mandamus under 28 U.S.C. § 1361. The complaint requested: class certification of all similarly situated U.S. Navy members;[5] correction of military records; reinstatement; payment of all forfeitures, lost duty pay, and back pay; and all promotions due. Further, Williams asked for an injunction prohibiting the Navy from further use of its urinalysis program on the grounds that it denied him due process, and constituted a violation of the Fourth Amendment guarantee against unreasonable search and seizure and the Fifth Amendment's guarantee against self-incrimination.

On August 30, 1983, the Government moved to dismiss, inter alia, for failure to exhaust remedies available within the military. The district court denied that motion on December 12, 1983, holding that though exhaustion of military remedies is generally required before judicial review of military decisions can be pursued, there are exceptions where "the case is constitutional in nature" (citing Downen v. Warner, 481 F.2d 642 (9th Cir.1973)), and that Williams' suit fell within such an exception:

Here the plaintiffs complain of a Navy policy established pursuant to a Department of Defense Directive (No. 1010.1, March 16, 1983). Reversal of their individual convictions seems highly unlikely, and even that result would leave the disputed regulation in place. See, Glines v. Wade, 586 F.2d 675 (9th Cir.1978). This Court will not require further pursuit of administrative remedies if such action would be an exercise in futility. Baxter v. Claytor, 652 F.2d 181 (D.C.Cir. 1981).

Since the claim in this case is constitutional in nature and challenges a policy originating in the highest levels of the military establishment, it is evident that further pursuit of the plaintiffs' claims through administrative channels would be useless.

---

**3.** Special Courts-Martial are convened under 10 U.S.C. § 816 *et seq.* (1982 & Supp. I 1983), and are presided over by a lawyer-judge. The accused is provided with military counsel but may, as did Williams, secure civilian counsel.

**4.** The other named plaintiffs ultimately settled with the Navy. Their claims are not at issue in this appeal.

**5.** The district court denied class certification for failure to show numerosity.

The Navy then moved for summary judgment on the above Fourth and Fifth Amendment issues. The court held that motion for ruling following trial. Because the court never ruled on that motion, it is not before us.

On September 25–27, 1984, following discovery and the filing of numerous motions, trial was held on the issue of the accuracy of the tests. On September 27, when Williams failed to appear for trial for the third consecutive day, the district court ruled from the bench that he had failed to present any evidence that he had not had an opportunity to present before his Special Court-Martial concerning validity of the urinalysis tests or the manner in which they were conducted, and had presented no evidence on damages. The court concluded, therefore, that Williams had not shown that he had been denied due process. In a Memorandum Opinion filed October 11, 1984, the district court again stated that Williams had failed to carry his burden of proof. This appeal followed.

### Issues Presented

Whether the district court erred in hearing Williams' suit and in dismissing the complaint on the merits.

### OPINION

#### A. *Jurisdiction*

Williams' appeal was filed November 20, 1984 in the United States Court of Appeals for the Fourth Circuit. On July 22, 1985 Navy moved to transfer to the Federal Circuit under 28 U.S.C. § 1631. Williams opposed that motion. On August 14, 1985, the Fourth Circuit transferred the appeal, citing *Wronke v. Marsh*, 767 F.2d 354 (7th Cir.1985), and *Van Drasek v. Lehman*, 762 F.2d 1065 (D.C.Cir.1985). °

In his opposition to Navy's motion, Williams said it was "inaccurate" to view his complaint as based, in whole or in part, on 28 U.S.C. § 1346(a)(2) (the "Little Tucker Act"). Noting that he had waived all damages in excess of $10,000, Williams said "[b]ecause the action is of an equitable nature, it was not brought pursuant to the Tucker Act, but under [28 U.S.C. §§ 1331 and 1361] as the Court of Claims [sic] has no equitable jurisdiction."[6] As Williams' own assertions make clear, however, transfer in this case was proper.

■ The federal courts have the power, and the duty, to determine their own jurisdiction. *Dubost v. U.S. Patent and Trademark Office*, 777 F.2d 1561, 1564, 227 USPQ 977, 979 (Fed.Cir.1985). Mere recitation of a basis for jurisdiction, by either a party or a court, cannot be controlling: federal courts are of limited jurisdiction, and may not alter the scope of either their own or another courts' statutory mandate. *Chemical Engineering Corp. v. Marlo, Inc.*, 754 F.2d 331, 333 (Fed.Cir.1984). Substance, not form, is controlling: "we look to the true nature of the action in the district court in determining jurisdiction of an appeal." *Maier v. Orr*, 754 F.2d 973, 982 (Fed.Cir.1985); *In Re Snap on Tools Corp.*, 720 F.2d 654 (Fed.Cir.1983).

As did the plaintiff in *Maier v. Orr, supra*, Williams: (1) alleged jurisdiction under 28 U.S.C. §§ 1331 and 1361; (2) added claims for money damages; and (3) waived recovery of damages in excess of $10,000 (originally in excess of $23,000) when challenged by the government, saying he did so to preserve jurisdiction in the district court. It is well-settled that "a plaintiff ... should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the

---

**6.** Williams' references to the Court of Claims, abolished by Congress in the Federal Courts Improvements Act of 1982, P.L. 97–164, 96 Stat. 25, indicate confusion. The Court of Claims was granted equity powers in 1972. *See* P.L. 92–415, 86 Stat. 652 (1972). If Williams meant the United States Claims Court, he was equally mistaken. Under 28 U.S.C. § 1491(a)(2), the Claims Court may "[t]o provide an entire remedy and to complete the relief afforded by the judgment ... issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records ..." It may remand appropriate matters to any administrative or executive body or official "with such direction as it may deem proper and just." *Id.*

Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute." *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967 (D.C.Cir.1982). And yet, that is precisely what Williams has attempted to do by labeling his suit as filed exclusively under 28 U.S.C. §§ 1331 and 1361.

■ Because the substance of the pleadings define a suit for money damages and restitution under 28 U.S.C. § 1346(a)(2), *Maier v. Orr,* 754 F.2d at 982, we recharacterize the pleadings accordingly. *See also Bockoven v. Marsh,* 727 F.2d 1558 (Fed.Cir. 1984).

■ As the Fourth Circuit's order correctly noted, the Federal Circuit has *exclusive* jurisdiction of any appeal from a judgment of a district court based, in whole or in part, on 28 U.S.C. § 1346(a)(2). Presence of additional allegations, e.g. those of constitutional deprivation here, does not divest this court of its constitutionally granted jurisdiction of the entire case. To hold to the contrary would defeat the purposes of Congress in its enactment of the Federal Courts Improvement Act, Pub.L. No. 97–312, 96 Stat. 25 (1982). *See Hohri v. United States,* 782 F.2d 227 (D.C.Cir.1986) (Markey, Chief Judge, dissenting); *Bray v. United States,* 785 F.2d 989, No. 85–2614 (Fed.Cir.1986) (Order). Exclusive jurisdiction of this appeal therefore rests, 28 U.S.C. § 1295(a)(2) (1982), in this court. *See Wronke v. Marsh, supra,* 767 F.2d 354; *Van Drasek v. Lehman, supra,* 762 F.2d 1065; *Professional Managers' Ass'n v. United States,* 761 F.2d 740 (D.C.Cir.1985); *Hahn v. United States,* 757 F.2d 581, 587 n. 3 (3d Cir.1985); *Wilson v. Turnage,* 755 F.2d 967 (D.C.Cir.1985); *Oliveira v. United States,* 734 F.2d 760, 762 (11th Cir.1984).

## B. *The Parties' Contentions on Appeal*

On appeal, Williams challenges the district court's decision not to rule on the Fourth Amendment unreasonable search and seizure issue or on the Fifth Amendment self-incrimination issue. He further alleges the per se insufficiency of a single set of urinalysis results to support conviction (a substantive due process issue). Williams says a stipulation setting forth the basic facts of the sweep entered in a pretrial conference supports the constitutional challenges.

The Government contends that the district court should have dismissed the complaint for Williams' failure to exhaust remedies available within the military, but urges this court, in any event, to affirm the judgment.

## C. *Exhaustion of Remedies Within the Military*

■ The general rule requires that, before seeking to collaterally attack his court martial conviction in the civilian courts, Williams must have exhausted all remedies available to him within the military. *See, e.g., Schlesinger v. Councilman,* 420 U.S. 738, 758, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975)[7]; *Gusik v. Schilder,* 340 U.S. 128, 131–32, 71 S.Ct. 149, 151–52, 95 L.Ed. 146 (1950); *see also Middendorf v. Henry,* 425 U.S. 25, 29 n. 6, 96 S.Ct. 1281, 1285 n. 6, 47 L.Ed.2d 556 (1976). That is true whether Williams alleges violation of the Constitution, statutes, or military regulations.[8]

---

**7.** As the Supreme Court has noted, there is no conflict between the general rule and that permitting collateral impeachment of "void judgments", i.e. judgments of a military court not "within the scope of its jurisdiction and duty". *Schlesinger v. Councilman,* 420 U.S. at 747–49, 95 S.Ct. at 1307–08; *see also Runkle v. United States,* 122 U.S. 543, 7 S.Ct. 1141, 30 L.Ed. 1167 (1887) (collateral attack in backpay suit in Court of Claims); *Ex Parte Reed,* 100 U.S. 13, 25 L.Ed. 538 (1879) (habeas corpus). *See generally* Rosen, *Civilian Courts and the Military Justice System: Collateral Review of Courts-Martial,* 108 Mil.L.Rev. 5, 67 & n. 390 (1985). Williams

makes no allegation before us that his conviction was not within the scope of the jurisdiction and duty of the military court.

**8.** In *Mindes v. Seamans,* 453 F.2d 197, 201 (5th Cir.1971), the court said that (1) allegation of a deprivation of a constitutional right or violation of statute or regulations, and (2) exhaustion of remedies provided by the military, are necessary, but added four further factors to consider before a court may exercise jurisdiction to review military affairs. *Id.* at 201–02.

The *Mindes* test has been followed by a number of courts. *See Williams v. Wilson,* 762 F.2d

■ The exhaustion doctrine is fully applicable in this case. Williams had two avenues for appealing his conviction by special court-martial. The first was through appeal to the Judge Advocate General under 10 U.S.C. § 869(b) (1982 & Supp. 1985):

(b) The findings or sentence, or both, in a court-martial case not reviewed under subsection (a) [general court-martial] or under section 866 of this title (article 66) [Review by Court of Military Review] may be modified or set aside, in whole or in part, by the Judge Advocate General on the ground of newly discovered evidence, fraud on the court, lack of jurisdiction over the accused or the offence, error prejudicial to the substantial rights of the accused, or the appropriateness of the sentence....

The second avenue for review within the military was through the Board for Correction of Naval Records, which had the power to recommend to the Secretary of the Navy action necessary to correct errors in records—including an expunging from the records, reinstatement, and back pay. 10 U.S.C. § 1552 (1982); 32 C.F.R. § 723 (1984). *See Baxter v. Claytor,* 652 F.2d 181, 184–85 (D.C.Cir.1981); *Knehans v. Alexander,* 566 F.2d 312, 315 (D.C.Cir.1977), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1646, 56 L.Ed.2d 83 (1978).[9] As above indicated, Williams availed himself of no service-provided remedy.

The district court believed it had jurisdiction to review Williams' court-martial on the basis of *Downen v. Warner,* 481 F.2d 642 (9th Cir.1973). In *Downen,* which did not involve a court martial, the district court had dismissed a suit (filed under 28 U.S.C. §§ 1346(a)(2) and 1346(d)) for failure to exhaust administrative remedies. The Ninth Circuit reversed, crafting a narrow exception for cases where "resolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board." 481 F.2d at 643. The court observed that, at least in Downen's case, there was no need to "facilitate the development of a full factual record, or to encourage the exercise of administrative expertise and discretion, and to promote judicial and administrative efficiency." *Id.* Assignment of exclusive appellate jurisdiction to this court, 28 U.S.C. § 1295(a)(2), renders it unnecessary to discuss whatever may have been the appropriateness of the Ninth Circuit's approach in *Downen.*

We reject the district court's conclusory statement that Williams' pursuit of remedies within the military "would be an exercise in futility" as a basis for disregarding the exhaustion requirement. To the contrary: encouraging premature rushes to the federal courthouse renders futile Congress' statutory provision of remedies within the military. To arrive at the prediction that pursuit of a remedy elsewhere would be "useless", a court must in effect hear the case, thus often strangling the exhaustion requirement at the outset. Beyond the purely conjectural context of many "futility" predictions, they tend to defeat the very purpose of the requirement, which is to give the military decision-maker a chance to determine whether a complainant's pursuit in that particular case may be meritorious and, if not, a chance to say why. *See Schlesinger v. Councilman,* 420

357, 359 (4th Cir.1985); *Penagaricano v. Llenza,* 747 F.2d 55, 60–61 (1st Cir.1984); *Gonzalez v. Department of Army,* 718 F.2d 926, 929–30 (9th Cir.1983); *Rucker v. Secretary of the Army,* 702 F.2d 966, 969–70 (11th Cir.1983); *Nieszner v. Mark,* 684 F.2d 562, 563–64 (8th Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1273, 75 L.Ed.2d 494 (1983); *Lindenau v. Alexander,* 663 F.2d 68, 71 (10th Cir.1981); *West v. Brown,* 558 F.2d 757 (5th Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 520 (1978). Another circuit, while declining to follow the entire *Mindes* approach, *see Dillard v. Brown,* 652 F.2d 316, 323 (3d Cir.1981), followed that portion holding exhaustion as a prerequisite. *See Bowman v. Wilson,* 672 F.2d 1145 (3d Cir.1982).

9. Congress amended § 1552 in 1983 to limit the Board's power to correction of records "to reflect actions taken by reviewing authorities...." 10 U.S.C. § 1552(f) (1982 & Supp.1983). However, this change was not effective until December 6, 1983, nearly six months after Williams was convicted by the Special Court-Martial and had filed this present action.

U.S. at 756, 95 S.Ct. at 1312. The district court's felt need to review the Navy's policy and regulation, if otherwise appropriate, is simply premature. The concern underlying the exhaustion requirement is not *whether* a federal court may review the constitutionality of a military policy or regulation, but *when* it may do so.

No court martial proceedings had occurred in any of the cases relied on by the district court. Whatever may be the merits or demerits of the argument for judicial intervention in those cases, it can bear no relation to cases in which remedies are available from a fully empowered body. The rationale for judicial intervention in *Glines v. Wade*, 586 F.2d 675 (9th Cir. 1978), was rejected by the Supreme Court in reversing the Ninth Circuit's judgment. *See Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). In *Baxter v. Claytor*, 652 F.2d 181 (D.C.Cir.1981), the court effectively enforced the exhaustion requirement, ordering the Board for Correction of Military Records to receive and consider the petition Baxter had presented to the Board. *Id.* at 186.[10]

Congress having provided the extensive and elaborate system designed to achieve justice within the military, no warrant appears for judicial end-running of that system. *See* Rosen, *Civilian Courts and the Military Justice System: Collateral Review of Courts-Martial*, 108 Mil.L.Rev. 5, 85 (1985). If the rush to the federal courthouse and bypassing the congressionally created system attempted here by Williams were permissable, Congress would be well advised to dismantle the military justice system as no longer required.[11]

At trial, Williams' co-plaintiffs presented extensive expert testimony alleging unreliability of their urinalysis tests (testimony on which Williams seeks to rely). Insofar as that testimony relates to the "facts" of this case, or to Williams' allegations respecting substantive due process, it could, and should, have been developed first for review within the military.[12] Moreover, Williams' suit challenges Navy's construction of the Uniform Code of Military Justice and the Military Rules of Evidence, matters peculiarly within the purview of the military courts. *See, e.g., Noyd v. Bond*, 395 U.S. 683, 695–96, 89 S.Ct. 1876, 1883, 23 L.Ed.2d 631 (1969); *Artis v. United States*, 506 F.2d 1387, 1389–90, 205 Ct.Cl. 732 (1974).

As the Supreme Court has often reminded us, sound policy underlies the deference granted military decisions by the Federal courts. "[J]udges are not given the task of running the Army." *Orloff v. Willoughby*, 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). The composition of the armed services is a matter within the discretion of the military. *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973). The power to regulate and discipline the armed forces is constitutionally committed to the Legislative Branch "by explicit grant of plenary power". *Chap-*

---

**10.** The Court of Claims has consistently upheld the general rule requiring exhaustion, limiting exception to certain specific circumstances not present here. *See, e.g., Hagarty v. United States*, 449 F.2d 352, 355, 196 Ct.Cl. 66 (1971), and cases cited therein. In *Bowling v. United States*, 713 F.2d 1558 (Fed.Cir.1983), a former serviceman who sought to collaterally attack his court-martial conviction had first exhausted the full scope of remedies available within the military. *Id.* at 1560.

**11.** In the Military Justice Act of 1983, Pub.L. No. 98–209, 97 Stat. 1393 (1983), Congress provided for Supreme Court issuance of writs of certiorari to the Court of Military Appeals. P.L. 98–209, 98th Cong. 1st Sess., § 10(a)(1), *codified at* 28 U.S.C. § 1259. Congress did not intend

thereby to reduce the independence of the military courts: "the Court of Military Appeals will remain the primary source of judicial authority under the Uniform Code of Military Justice." H.Rep. No. 98–549, 16–17, *reprinted in* 1983 U.S.Code Cong. & Ad.News 2177, 2182; *see also* Rosen, *supra* n. 7, at 81–83.

**12.** Questions respecting the reliability of laboratory screening of urinalysis samples have been raised, resulting in an order by the Surgeon General of the Navy that six thousand samples be retested. *See* Wellington, *The War on Drugs in the Military Courtroom*, 31 Fed.B. News & J. 333, 336–37. When it found that positive laboratory results were erroneous, Navy corrected personnel records and reversed disciplinary actions.

*pell v. Wallace,* 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983). Article I, § 8, cl. 14, provides that "Congress shall have Power ... to make Rules for the Government and Regulation of the land and naval Forces." The Congress is further granted the power to make all laws "necessary and proper" to exercise its power over the land and naval forces. Art. I, § 8, cl. 18; *see Dynes v. Hoover,* 61 U.S. (20 How.) 65, 79, 15 L.Ed. 838 (1858). As the Supreme Court has recently stated:

> [I]t is clear that the Constitution contemplated that the Legislative Branch has plenary control over rights, duties, and responsibilities in the framework of the military establishment, including regulations, procedures and remedies related to military discipline.

*Chappell v. Wallace,* 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983).

Thus, "perhaps in no other area has the Court accorded Congress greater deference." *Rostker v. Goldberg,* 453 U.S. 57, 64–65, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). Congress, along with the President in his role as Commander-in-Chief, has exercised that constitutional prerogative. Congress established and the President approved the Uniform Code of Military Justice, 10 U.S.C. §§ 801 *et seq.* (1982 & Supp. I 1983). Congress created and the President appointed Article I military courts which are not subordinate to the federal courts, but operate under their own procedures and rules of evidence. *See generally* Everett, *Some Observations on Appellate Review of Court-Martial Convictions— Past, Present, and Future,* 31 Fed.B. News and J. 420 (1984). "Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal establishment."

*Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953).

Maintenance of discipline and order is of paramount concern to the military in discharging its duty to defend the United States. So vital is that concern that members of the armed forces do not enjoy the full panoply of procedural entitlements afforded citizens in civilian courts, many of which procedural entitlements are inappropriate to the military. *Chappell v. Wallace,* 462 U.S. 296, 300–01, 103 S.Ct. 2362, 2365–66, 76 L.Ed.2d 586 (1983).[13] As the Supreme Court has observed, Courts-Martial are not independent instruments of justice, "but remain[ ] to a significant degree a specialized part of the overall mechanism by which military discipline is preserved." *O'Callahan v. Parker,* 395 U.S. 258, 265, 89 S.Ct. 1683, 1687, 23 L.Ed.2d 291 (1969). However:

> [I]mplicit in the congressional scheme embodied in the Code [of Military Justice] is the view that the military court system generally is adequate to and responsibly will perform its assigned task. We think this congressional judgment must be respected and that it must be assumed that the military court system will vindicate servicemen's constitutional rights.

*Schlesinger v. Councilman,* 420 U.S. at 758, 95 S.Ct. at 1313.

Because of the military's overriding interest in maintaining order within its own house, federal courts have properly avoided intervention and interference with respect to disciplinary actions taken by commanders or by military courts. *See, e.g., Chappell, supra,* 462 U.S. at 301–02, 103 S.Ct. at 2365–66; *see also Schlesinger,* 420 U.S. at 758, 95 S.Ct. at 1313; *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971); *Dynes, supra,* 61 U.S. (20

---

**13.** The military's need for rules separate and distinct from those available to civilians also finds textual support in the Constitution. The Fifth Amendment assures citizens immunity from prosecution for a capital or infamous crime without indictment by a Grand Jury, but specifically excepts members of the armed forces. *See Ex Parte Milligan,* 71 U.S. (4 Wall.) 2, 123–24, 18 L.Ed. 281 (1866). Indeed, it is precisely the willingness of the soldier not only to forego some of his or her constitutional rights, but to risk life itself, that preserves for the soldier's fellow citizens the opportunity of enjoying all of their constitutional rights to the fullest extent. A free society that no longer inspires that kind of dedication and sacrifice is unlikely to survive, or to deserve to.

How.) 65, 15 L.Ed. 838. The Supreme Court has stressed that "[c]ivilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers." *Chappell, supra,* 462 U.S. at 300, 103 S.Ct. at 2365. One reason for that hesitancy is the fear that civilian courts "will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community." *Relford, supra,* 401 U.S. at 368, 91 S.Ct. at 657. The period of hesitancy stressed by the Supreme Court is at least as long as that required for the exhaustion of remedies provided within the military services.

### *Appropriate District Court Action*

■ The district court should not have dismissed Williams' complaint on the merits, but at the outset should have granted the Government's motion to dismiss for failure to exhaust remedies available to him within the military. *See Artis v. United States,* 506 F.2d 1387, 1391, 205 Ct.Cl. 732 (1974).[14] Alternatively, the court could have stayed proceedings pending exhaustion of remedies within the military, *cf. Halifax Engineering, Inc. v. United States,* 221 Ct.Cl. 915, 917 (1979); *Pine v. United States,* 371 F.2d 466, 178 Ct.Cl. 146 (1967), or it could have entered a procedural order dismissing the case without prejudice to either party moving to restore it to the docket. We remand the case with instructions to vacate the judgment and to take further appropriate action consistent with this opinion.[15]

REMANDED.

---

**14.** In view of the outcome here, we need not, and do not, reach any question of whether the district court erred in denying Williams' request for class certification.

**15.** The statute of limitations applicable to suits for money damages in the district courts and in the Claims Court, 28 U.S.C. §§ 2401 and 2501, provides for such suits within 6 years "after the right of action first accrues." A claim based on an alleged unlawful discharge accrues on the date of discharge. *See, e.g., Hurick v. Lehman,* 782 F.2d 984, 986 (Fed.Cir.1986); *Wilson v. United States,* 231 Ct.Cl. 958 (1982); *Bonen v.*

*United States,* 666 F.2d 536, 229 Ct.Cl. 144, *cert. denied,* 456 U.S. 991, 102 S.Ct. 2273, 73 L.Ed.2d 1286 (1981); *Kirby v. United States,* 201 Ct.Cl. 527 (1973), *cert. denied,* 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974). A claimant can protect against application of the statute of limitations by simply filing a complaint in the appropriate court and moving to stay proceedings in that court until the exhaustion process is complete. The claimant Williams, however, sought simply to avoid the exhaustion requirement.