William A. ANDREWS, Plaintiff,

v.

James H. WEBB, Jr., Secretary of the Navy, Defendant.

Civ. A. No. 87–0614–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

April 28, 1988.

Gary Myers, Alexandria, Va., for plaintiff.

Dennis E. Szybala, Asst. U.S. Atty., Office of the U.S. Atty., Alexandria, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This is a suit by a career Marine Corps officer with 18 years of unblemished service, who contends that he was administratively separated from the service in violation of his Fifth Amendment Due Process rights. Plaintiff, William A. Andrews (Andrews), seeks a declaration of his rights, reinstatement to active duty at his prior rank, back pay to the jurisdictional limit of $10,000,[1] and expungement of pertinent military records. The dispute grows out of an unannounced urinalysis sweep conducted at Andrews' duty station in January, 1986. The results indicated Andrews had used marijuana recently. Various administrative proceedings followed. In these, Andrews, represented by counsel, claimed that the evidence against him was insufficient and that certain failures to follow prescribed procedures in the conduct of the urinalysis and the hearings violated his Fifth Amendment Due Process rights. An extensive administrative record was developed. Ultimately, after Andrews pursued his administrative remedies, he was administratively separated from the service and given a General Discharge under honorable conditions. He now asserts his constitutional and insufficient evidence claims in this Court.[2] The parties have agreed to submit the matter to the Court on the administrative record. The matter, having been fully briefed,[3] is now ripe for disposition. Accordingly, this Memorandum Opinion sets forth the Court's decision and its findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P.

### Facts

### Parties, Jurisdiction and Venue

Andrews is a former captain in the United States Marine Corps. His tenure in the Corps spanned 18 years, during which he rose through the enlisted ranks to win a commission and ultimately the rank of captain. His military record, up to the time of the incident in issue, was exemplary. In November, 1983, Andrews was assigned to duty in the Headquarters Battalion at the Marine Corps Base, Camp Lejeune, North Carolina. Though a disbursing specialist, he served first as Camp Lejeune's Officer-in-Charge of the Family Services Center

1. The original Complaint sought back pay in excess of $10,000. Defendant moved to dismiss pursuant to Rule 12(b)(1), on the ground that the claim was essentially one under the Little Tucker Act 28 U.S.C. § 1346(a)(2), and accordingly, that the district would have jurisdiction to entertain such claims against the United States only where damages sought do not exceed $10,-000. *See* 28 U.S.C. § 1346(a)(2); *see also Chula Vista City School Dist. v. Bennett,* 824 F.2d 1573, 1578–79 (Fed.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988); *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir. 1983); *cf. Gowar v. Lehman,* 799 F.2d 925 (4th Cir.1986). The Court was never required to decide this dismissal motion because the parties agreed to an order permitting the filing of an Amended Complaint limiting damages sought to less than $10,000, thereby eliminating any jurisdictional issue stemming from the amount of damages claimed against defendant. Little Tucker Act claims for amounts less than $10,000 are actionable concurrently in United States District Courts and in the United States Claims Court. *See* Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 129, 96 Stat. 39, amending 28 U.S.C. § 1346(a) and § 133(a), amending 28 U.S.C. § 1491.

2. The original defendant, James H. Webb, Jr., was appropriately named in the Complaint in his then official capacity as Secretary of the Navy. Since the filing of the Complaint, James H. Webb, Jr. has resigned and William L. Ball, III has been confirmed to succeed him. Accordingly, the appropriate defendant at this time is William L. Ball, III in his official capacity as Secretary of the Navy.

3. Among the briefs and memoranda filed are: Defendant's Motion in Support of Defendant's Motion for Judgment; Defendant's Proposed Findings of Fact; Defendant's Supplemental Memorandum in Support of its Motion for Judgment; Plaintiff's Reply Memorandum in Support of Defendant's Motion for Judgment; Plaintiff's Memorandum of Points and Authorities Regarding the Court's Request for Additional Information; Defendant's Second Supplement of His Motion for Judgment.

and then, at the times relevant here, as the Base's Special Projects Officer with offices in the Base Administrative Building.

Subject matter jurisdiction is properly premised on the "Little Tucker Act," 28 U.S.C. § 1346(a)(2), and on 28 U.S.C. § 1331, in light of the federal questions raised by Andrews' constitutional claims. Andrews also relies on the Administrative Procedure Act (APA) as a jurisdictional basis. Venue is not contested by defendant and is appropriate in this district by virtue of 28 U.S.C. § 1391.

*The Conduct and Results of the Urinalysis*

In January, 1986, in preparation for an Inspector General's review, an unannounced unit sweep urinalysis test was conducted of all military personnel assigned to the Base Administration Building. Andrews was included in this group. Procedures to be followed in conducting these tests were set forth in Base Order P5300.9. The pertinent procedures can be briefly summarized. Conduct of the tests requires a team of at least three personnel, the head of which must be an officer or a staff non-commissioned officer. One team member must act as the recorder, another as a collection agent and the third as a coordinator. The Recorder is charged with completing the heading of the custody document that accompanies each box of twelve urine sample bottles. Personnel to be tested present their military identification cards to the Recorder who records each person's name and social security number on the custody document. The Recorder is then required to place a gum label on the sample bottle. Then the social security number, date, batch number and sample bottle number are recorded on the gum label and then checked for accuracy and initialed by the person to be tested. The Recorder then gives the bottle to the person being tested. The latter individual then proceeds to the rest room where he or she provides a urine specimen while being observed by the collection agent. The Base Order limits to three the number of persons, including the collection agent, who can be in the rest room at the time the

sample is taken. After providing the sample, the individual being tested caps the sample bottle and returns it to the Recorder. The Recorder then prints the social security number and premise code (i.e., US for "unit sweep") on a second label which is placed over the cap. Following this, the coordinator places his initials on the first label to the right of the spot where the person being examined placed his or her initials. Each sample box holds twelve sample bottles. As each box of twelve samples is filled, the custody document is closed out and maintained with the box. The Recorder must exercise continuous custody and control over the bottles. Finally, the Order provides that urine samples should normally be returned to the Base Consolidated Drug and Alcohol Center (CDAC) on the day they are collected.

The pertinent unannounced unit urinalysis sweep commenced on January 30, 1986 at 1:00 PM under the overall supervision of Staff Sergeant Martin Estrada, the Substance Abuse Staff Non-Commissioned Officer for the Headquarters Battalion. Sergeant Estrada acted as collecting agent, observing the production of urine samples by male members of the unit undergoing the test. The other two team members were Sergeant William Green, who acted as Recorder, and Lance Corporal Jean Marie Fitzell, who acted as Recorder and collection agent for the relatively few women tested.

Andrews was one of the personnel tested in the unannounced unit sweep. After ensuring that his social security number was properly recorded on the label, Andrews took the bottle to the rest room, produced a urine sample and returned the bottle directly back to the Recorder. In a deviation from the strict letter of the Base Order, Sergeant Green testified that the labels were initialed by the person to be tested prior to affixing the label to the bottle rather than after as the procedure provided. The reason, he explained, was that it was easier to write on the flat surface. In any event, the bottle was immediately given to each examinee, including Andrews. In a second deviation, the Recorder failed to add his initials next to Andrews' on the

label when the full bottle was returned. There is, however, no claim by Andrews that the bottle he gave the Recorder was not the bottle he was given to take into the rest room. Moreover, Andrews testified that he maintained possession of his bottle throughout the test, giving it to the Recorder at the end.

Testimony at the hearings disclosed other deviations or alleged deviations from details of the Base Order procedure. The Order limits to three the number of persons allowed in the rest room during the sample collection process. The provision is apparently aimed at preventing substitution of samples. Sergeant Estrada admitted that on occasion he permitted an additional examinee to be present in the rest room. No adulteration of Andrews' sample could have occurred, however, because Andrews, by his own admission, maintained exclusive possession of his bottle throughout the session in the rest room.

Paragraph 5010.5.1 of the Base Order provides that only one sample bottle should be on the table at one time. Sergeant Green essentially complied with this provision by rigorously adhering to a procedure of processing one bottle at a time. While he kept the box of empty bottles on the table to his left, he processed only one examinee at a time. As each person approached the table, Green removed a bottle from the box and placed the person's identification card in the slot from which the bottle had been taken. Green would then go through the labelling and initialing process and give the bottle to the examinee who would then proceed into the rest room and produce a sample while maintaining continuous possession of the bottle. The examinee would then return the bottle to Green who would place the evidence label on the top and the examinee would again check the bottle and initial the second label. Green would then place the full bottle back in its slot and remove and return the ID card to the examinee. This procedure essentially comports with the Order as only one bottle was out of the box on the table

at a time and only one bottle and one examinee were processed at a time.

The Base Order requires the Recorder to exercise continuous custody and control of completed sample bottles. On two occasions, Sergeants Estrada and Green went to the upper floor of the building to obtain urine samples from senior headquarters staff members. Each trip took no more than ten to fifteen minutes and on each occasion, Estrada and Green maintained in their possession the custody documents and the box of sample bottles then in use. Samples already taken were left in Corporal Fitzell's care and custody and she was ordered to halt testing and permit no one near the bottles until the other two team members returned. This is not, strictly speaking, a deviation from the Base Order. While the Order requires the Recorder to exercise continuous custody and control of the samples, it also permits personnel to switch roles if appropriate. In this instance, Corporal Fitzell effectively acted as Recorder with respect to the samples left behind. While the other team members were absent, she did nothing but watch the samples. Nor can it be said that Estrada and Green left their duty stations during the test. Rather, they stopped the testing for the short period of their absences and took adequate steps through Fitzell to ensure the integrity of the samples already collected.

The sweep was completed and all samples collected on or about 4:20 PM of the same day the sweep was commenced. The Base Order provided that urine samples should normally be taken to the Base Consolidated Drug and Alcohol Center (CDAC) on the day of collection. As it happened, the CDAC closed at 4:00 PM. Accordingly, Sergeant Estrada made appropriate arrangements for the samples to be delivered to the CDAC early the next morning. Such delays in delivery were apparently not uncommon and, in any event, the Base Order was not unconditionally mandatory on this point. In any event, Sergeant Estrada made arrangements to maintain appropriate security with respect to the sample bottles by placing them in a refrigerator [4]

4. The refrigerator was equipped with a lock that was broken at the time.

in his office and then locking his office windows and door, the latter with a dead-bolt. Only three keys to the deadbolt were in existence. All were in the possession of authorized personnel, including Estrada. Significantly, Sergeant Estrada's office was adjacent to the Watch Office manned on a 24 hour basis. Watch personnel locked the building at night and checked doors within the building, including Estrada's office, to insure all were locked. There was no evidence of any attempt to enter Estrada's office overnight. The samples were promptly delivered by Sergeant Estrada to the CDAC at 7:00 AM the next morning. There, the boxes were subjected to an inventory and each specimen bottle was checked against the custody documents. Thereafter, the boxes of bottles were packed in a tamper-proof shipping container and mailed that same day to the U.S. Navy Drug Testing Laboratory, Jacksonville, Florida.

In Jacksonville, the boxes of samples were received and inspected for damage or breaches of integrity. No evidence of either was found. The samples were then tested. An aliquot portion of Andrews' urine sample was subjected to radioimmunoassay analysis (RIA)[5] for the presence of six drugs. The sample tested positive for the presence of total cannabinoid metabolites.[6] A second portion of Andrews' urine sample was subjected to the same RIA analysis for verification purposes. The results were again positive. Next, another portion of Andrews' urine sample was subjected to quantitative analysis through the use of gas chromatography-mass spectroscopy (GCMS).[7] The GCMS test, unlike RIA, focuses sharply on only one cannabinoid metabolite, THC, and measures accurately its concentration.[8] This test confirmed the presence of THC and determined that its concentration in Andrew's urine sample was fifty-eight nanograms per milliliter, a relatively low concentration. Andrews' specimen was then preserved by freezing and later, at the request of Andrews' commanding officer, the same GCMS testing was performed on another portion of Andrews' urine sample with essentially the same result (51 nanograms).

The significance of these concentrations is illuminated by the Department of Defense (DOD) standards. The DOD standard concentrations for RIA and GCMS tests are set at levels designed to exclude the possibility of passive ingestion or inhalation of marijuana. With respect to the RIA test, which measures the concentration of all cannabinoids, the DOD standard is 100 nanograms. Readings below this figure, according to the expert chemist, are considered negative and those above are positive. Andrews' urine samples subjected to RIA were twice above 100 nanograms, but the record does not disclose the exact levels. With respect to the GCMS test, which measures only TCH concentration, the cutoff is 20 nanograms. The THC concentrations in Andrews' samples were twice found to be above the DOD cut off,

---

**5.** RIA is one of the most widely used methods for drug screening. It is specifically designed to detect the classes of drugs most widely abused, including marijuana. If specific drugs are present in the urine, the antibodies to those drugs will react with a test reagent or mixture. Quantitative results are usually measured in billionths of a gram, or nanograms. Because low levels of radiation are involved, RIA can be used only in a licensed laboratory. *See* Note, *Drug Testing in the Workplace: The Need for Quality Assurance Legislation,* 48 Ohio St.L.J. 877 (1987).

**6.** Marijuana contains fifty chemical substances peculiar to it which are collectively termed "cannabinoids." Among these is tetrahydrocannabinol (THC), the predominant psychoactive cannabinoid metabolite. It is typically the most prevalent metabolite in urine. By Department of Defense Standards, a positive RIA result means that the collective concentration of all the cannabinoids in the urine sample is at least 100 nanograms per milliliter.

**7.** GCMS is the most sophisticated state-of-the-art confirmatory method available. It breaks different compounds down into electrically charged ion fragments, thereby permitting positive qualitative identification and quantitative measurement of specific metabolites. *See* Note, *supra* note 5.

**8.** GCMS is generally considered the most accurate test available to the scientific community. *See Williams v. Secretary of the Navy,* 787 F.2d 552, 555 (Fed.Cir.1986).

58 nanograms on the first test and 51 nanograms on the second.[9]

*The Administrative Process and Hearing*

Given the test results, Marine Corps Order (MCO) 5300.12 required the Base Commanding General to order that Andrews be administratively processed for discharge pursuant to the procedures set forth in Secretary of the Navy Instruction 1920.6A. In accordance with this instruction, the Commanding General of Camp Lejeune appointed a Board of Inquiry, composed of three commissioned officer, to conduct a hearing to determine whether Andrews had engaged in illegal drug use. In essence, the hearing was Andrews' opportunity to show cause why he should not be administratively separated from the armed services.

The hearing was held in May, 1986, spanned three days and involved the testimony of twenty-nine witnesses. The record consists of a 247 page single-spaced verbatim transcript of the proceeding and the thirty-five exhibits received into evidence. At the hearing, Andrews was represented by Captain N.H. Winters, a Marine Corps lawyer. Lt. Colonel M.R. McCarthy, another Marine Corps lawyer, acted as the Board's Recorder[10] charged with presenting the Board with the relevant evidence.[11]

In the course of the hearing, Andrews presented twelve character witnesses, including his wife. The character witnesses uniformly praised Andrews' dedication and reputation. Some used the terms "outstanding" and "dedicated" to describe Andrews while a senior non commissioned officer called him "one of the finest officers I've worked with." Several gave Andrews the ultimate marine accolade, *viz* that they would have no hesitation in serving at his side in combat. All expressed surprise and disbelief at the notion that Andrews would use marijuana. Andrews testified in his own behalf and emphatically denied the knowing use of any marijuana. He suggested no hypothesis to explain the presence of the drug in his urine. He did note, however, that in his opinion he could have avoided the test had he chosen to do so. Testimony from other witnesses was in conflict on this point.

The Recorder presented evidence to support the integrity of the test and the entire chain of custody of Andrews' urine sample. Thus, all three members of the urinalysis team gave detailed testimony on the conduct of the urinalysis sweep of January 30, 1986, including the procedures actually followed, the overnight storage and security of the samples and the delivery of the samples to the CDAC. The Recorder also presented testimony to establish how the CDAC handled the samples and shipped them to the laboratory.[12] Among the wit-

---

**9.** Andrews' request for a retest on February 28, 1986, was denied by his battalion commander. Expert testimony at the Board of Inquiry hearing established that THC present on January 30, 1986, would very likely have disappeared from Andrews' urine by February 28, 1986.

**10.** An Assistant Recorder, Captain L.R. Hamlett, was also appointed and present.

**11.** At the outset of the hearing, Lt. Col. McCarthy described the duties of the Recorder in the following terms:

The recorder's role in a hearing of this nature is somewhat different than perhaps a prosecutor. This is technically not an adversary proceeding. In other words, the recorder's responsibility is not to argue a case for conviction or for a finding of cause to separate, but it is to make sure that the evidence is before the board on which to base its findings, and we will do that job. However, having reviewed the evidence, it is the position of the recorder, as a representative of the Govern-

ment, that this evidence will, when viewed in the light most favorable to the respondent, cause this board to return a finding of cause for separation.

SECNAVINST 1920.6A spells out the structure and procedure for three administrative boards: (1) the Board of Officers; (2) the Board of Inquiry; and (3) the Board of Review. The regulations require that each board appoint a recorder, but the Board of Inquiry regulations are silent as to the recorder's duties. Yet the Board of Officer and Board of Review regulations provide that the recorder shall "perform such duties as appropriate." It is reasonable to infer that this provision also applies to Boards of Inquiry. The duties performed by the Recorder here are in conformity with this regulation.

**12.** Mr. V. Folen, Forensic Chemist and Toxicologist at the U.S. Navy Drug Testing Laboratory, testified at length on the laboratory's test methodologies, rigorous quality control procedures and results of the tests.

nesses presented by the Recorder were two rebuttal witnesses on the issue of good military character. One of these testified that he had overheard Andrews admit to prior marijuana use, although the witness also admitted believing that the statement had been made in jest.

After hearing and considering all the evidence, the Board of Inquiry issued its findings orally on May 7, 1986, and in writing on May 13, 1986. A majority of the Board concluded:

(i) that Andrews had "knowingly and wrongfully inhaled or ingested marijuana during the month of January, 1986;"

(ii) that Andrews' denial was "without truthful foundation;"

(iii) that divergences from the Base Order in the conduct of the urinalysis "did not compromise the integrity of the test;" and

(iv) that it was highly unlikely that Andrews could have avoided the test as he had contended.

The majority went on to recommend that Andrews be discharged from the service with a "general discharge under honorable conditions." It also noted Andrews' "sterling 18 year military career" and his potential for future military service and thus recommended that the Secretary of the Navy consider clemency in this case. Specifically, it recommended retaining Andrews on active duty provided that he successfully completed an appropriate drug rehabilitation program. One member of the Board dissented. He filed a minority report, concluding that while Andrews' urine sample contained THC, the evidence was insufficient to warrant a finding of knowing ingestion.

On May 16, 1986, the Commanding General of Camp Lejeune signified his concurrence in the Board majority's finding and recommendation concerning discharge, but specifically rejected the clemency recommendation. Thereafter, on June 19, 1986, pursuant to governing instructions, the matter was reviewed by the Marine Corps' Assistant Deputy Chief of Staff for Manpower, who recommended that the Secretary of the Navy discharge Andrews on the basis of the finding and recommendation of the Board of Inquiry. On July 9, 1986, the Secretary of the Navy, acting through his designate, the Assistant Secretary of the Navy for Manpower, accepted this recommendation and moved to implement it. Seeking to forestall the discharge, Andrews filed an injunction action in this Court on July 16, 1986. After a prompt hearing, the Court granted the government's motion to dismiss the case for failure to exhaust administrative remedies. Andrews was shortly thereafter given a general discharge from the Marine Corps under "honorable" conditions.[13] Subsequently, Andrews sought reinstatement and other relief by filing and pursuing a petition with the Board of Corrections for Naval Records (BCNR). That Board reviewed the matter, met in executive session and then on April 17, 1987, it denied Andrews' requested relief. A majority concluded that there was insufficient evidence to establish that the Board of Inquiry had made a material error or that an injustice had occurred.[14] One member of the BCNR dissented, expressing the view that Andrews' misconduct did not warrant the harsh remedy of a discharge. After the BCNR's denial of relief, Andrews filed this action.

---

13. This discharge category is defined in SECNAVINST 1920.6A (2)(b), as follows:

General (Under Honorable Conditions). If an officer's service has been honest and faithful, it is appropriate to characterize that service under Honorable conditions. Characterization of service as General (Under Honorable Conditions) is warranted when significant negative aspects of the officer's conduct or performance of duty outweigh positive aspects of the officer's military record.

14. The BCNR's conclusion included the following statement:

It is regretted that the circumstances of your case are such that a favorable action cannot be taken. You [Andrews] are privileged to submit new and material evidence for consideration. However, the burden is on you to show that an error or injustice has occurred. There is no indication that Andrews made any further submissions to the BCNR.

### Analysis

This is judicial review of an armed service's administrative determination to discharge a commissioned officer for illegal drug use. It is not *de novo* review; rather, it is settled[15] that such review is limited to determining whether the action was "arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed.Cir.1983) (quoting *DeCicco v. United States*, 677 F.2d 66, 70 (Ct.Cl.1982)). In *Wronke v. Marsh*, 787 F.2d 1569 (Fed.Cir.) *cert. denied*, —— U.S. ——, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986), an army reserve officer with 15 years of service challenged a disciplinary discharge.[16] There, as here, the discharged officer disputed the result of an administrative process culminating in an adverse determination by a Board for the correction of records.[17] Chief Judge Markey described the appropriate judicial review standard in the following terms:

> Under the precedent in this court, Wronke was bound by the [Board's] determination that he was unsuitable, unless he established that that determination was arbitrary, capricious, contrary to law, or unsupported by substantial evidence, [citations omitted] and unless he did so by "cogent and clearly convincing evidence."

787 F.2d at 1576 (quoting *Dorl v. United States*, 200 Ct.Cl. 626, 633, *cert. denied*, 414 U.S. 1032, 94 S.Ct. 461, 39 L.Ed.2d 323 (1973)).

■ With this review standard as its lens, the Court has carefully examined the entire administrative record in this matter.[18] The results of this review are negative; there is nothing in the record to support the contention that the BCNR's determination, or that of the Board of Inquiry, were arbitrary, capricious, contrary to law or unsupported by substantial evidence. Instead, the review discloses the contrary. Far from any arbitrariness or capriciousness, the record reflects complete administrative due process. Andrews was given ample notice, representation by diligent, competent counsel, and a full opportunity to be heard, all in accordance with the applicable regulation. *See* SECNAVINST 1920.6A; *cf. Alberico v. United States*, 783 F.2d 1024, 1027.28 (Fed.Cir.1986) (all that due process requires is notice and an opportunity to be heard; failure to provide hearing before, rather than after, termination of a property interest is not violative of due process).

Further evidence of the absence of any arbitrariness or capriciousness is the extensive Board of Inquiry hearing record. This record reflects a painstaking, conscientious search by Board members for a plausible, but innocent explanation for the positive

---

15. Prior to October, 1982, Little Tucker Act cases were reviewable by the various regional Circuit Courts of Appeal. As of that date, Congress conferred on the Court of Appeals for the Federal Circuit exclusive appellate jurisdiction over such cases, thereby giving effect to congressional desire for uniformity in this area of the law. *See Heisig*, 719 F.2d at 1156; *see also United States v. Hohri*, —— U.S. ——, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987) (a motivating concern of Congress in creating the Federal Circuit was the special need for nation-wide uniformity in this area of the law); S.Rep. No. 275, 97th Cong., 1st Sess. 2 (1981).

16. The Army major in *Wronke* was discharged after a Board of Inquiry determined he had fraudulently obtained an FAA pilot's license by misrepresenting his Army flight status. A district court reversed and ordered reinstatement on the basis of findings of a National Transportation Safety Board (NTSB) hearing. The Federal Circuit reversed, holding that an NTSB pro-

ceeding had nothing to do with an officer's suitability to serve and did not estop the Army from discharging an officer.

17. In *Wronke*, the Board was the Army Board for Correction of Military Records, the Army analog of the Navy's BCNR.

18. The parties do not dispute that "[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606, 84 L.Ed.2d 643 (1985). Moreover, the focus is further limited to issues raised below, other issues having been waived. *See Maier v. Orr*, 754 F.2d 973, 984 (Fed.Cir.1985); *Doyle v. United States*, 599 F.2d 984 (Ct.Cl.1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980).

urinalysis result. They concluded there was none. Equally vigorous was the Board's hunt for breaks in the chain of custody or substantial doubts about the integrity of the sweep and the tests. Again, none was found. Thereafter, the record reflects that the Board's findings and recommendations were reviewed by the Base Commanding General, the Assistant Deputy Chief of Staff for Manpower of the Marine Corp, the BCNR and the Secretary of the Navy through his designee. In sum, the record reflects an administrative process that is the very antithesis of arbitrary and capricious action.

 Nor can it be said that the BCNR's conclusion, based on the Board of Inquiry's hearing and findings, is unsupported by substantial evidence. There is ample credible evidence in the administrative record to support the conclusion that the urine sample identified to the Navy's Drug Testing Laboratory was, in fact, the sample Andrews provided during the January 30, 1986 sweep. Similarly, there is ample, credible record evidence to support the Board's conclusion that Andrews' urine sample contained THC, a marijuana metabolite, in amounts consistent with the knowing use of this illicit drug. Thus, it was open to two of the three Board members and to the BCNR to reject Andrews' denial of knowing ingestion of the drug. It is well settled as a matter of law that evidence consisting solely of urinalysis laboratory results is sufficient to prove wrongful marijuana use in a criminal case beyond a reasonable doubt.[19] And this

holds true even where the defendant introduces evidence which purports to undermine or contradict the inference of wrongful use flowing from the test results.[20] *A fortiori*, therefore, such urinalysis evidence is sufficient to show knowing use in a civil case. In short, the findings of this administrative record are supported by substantial evidence in the record.

In reaching these conclusions, the Court is mindful that there was substantial testimony concerning Andrews' good character. An impressive number of his fellow officers viewed him as an exemplary Marine, one whom they would be confident to have by their side in combat. Those with knowledge of his work testified that he ably administered the Base Family Service Center, the organization that assists Marines and their dependents with domestic difficulties. There was also testimony that Andrews had an unblemished reputation among disbursing officers and was not known to overindulge in alcohol or to use drugs of any kind. There was some contrary character evidence, including a subordinate civilian social worker who testified emphatically that Andrews displayed unacceptable insensitivity to issues of race and sex in the workplace. This testimony, if accepted, rebuts or casts doubt on the positive character testimony for it concerns behavior by Andrews that is wholly inconsistent with Marine Corps policy. Apart from this, Board members had abundant evidence to show that the urine sample Andrews provided in the sweep contained levels of THC consistent with knowing in-

---

19. *United States v. Harper*, 22 M.J. 157 (C.M.A. 1986); *see also United States v. Wynn*, 11 U.S.C. M.A. 195, 29 C.M.R. 11 (1960); *United States v. Ford*, 4 U.S.C.M.A. 611, 16 C.M.R. 185 (1954).

20. *United States v. Ford*, 23 M.J. 331 (C.M.A. 1987) is, in important respects, essentially similar to the case at bar. There, an enlisted man found guilty of wrongful marijuana use was sentenced to a bad conduct discharge, 30 days confinement and loss of pay, and reduction to E-1. Positive urinalysis results were the basis of the inference of wrongful use of marijuana. The Court of Military Appeals held this evidence alone was sufficient to prove wrongful and knowing use beyond a reasonable doubt even though defendant introduced contradictory evidence. The contradictory evidence consisted of

defendant's denial of marijuana use or possession, defendant's testimony that he had no direct knowledge of how or why his sample tested positive, and several witnesses who testified that they observed no abnormalities in his behavior. Interestingly, the defendant in *Ford*, unlike Andrews, offered an innocent hypothesis for the presence of marijuana in his urine. He and a friendly witness testified that his wife was unhappy in the marriage, dissatisfied with the military and occasionally in possession of marijuana. Defendant, from this, invited the inference that his wife had spiked his food. The Special Courts-Martial rejected this hypothesis, found defendant guilty, and the Court of Military appeals affirmed.

gestion of marijuana.[21] Board members questioned Andrews and those who conducted the sweep and tests at exhaustive length. Ultimately, two of the three Board members did not believe Andrews' denial of knowing use. In reaching this conclusion, those Board members plainly made a number of credibility determinations. Conceivably, this Court, had it heard the matter *de novo*, might have made different credibility determinations, or weighed the evidence differently. But reviewing courts do not sit to substitute their judgment on credibility and the weight of the evidence for that of the administrative trier of fact. These are the province of the administrative fact finders.[22] Thus where, as here, the administrative findings are supported by substantial record evidence, they must not be overturned by a reviewing court simply because that court might reach different credibility determinations or weigh the evidence differently.

▪ Another of Andrews' principal claims, pressed vigorously here, is that breaches of the Base Order concerning urinalysis testing procedures denied him constitutional due process. More specifically, he lists eight alleged breaches of the Base Order by the testing team.[23] The Court has subjected each of these allegations to close scrutiny to ascertain whether any undermine confidence in the test results or rise to the level of a denial of due process. None do. Indeed, several do not even amount to violations of the Base Order.[24] Even those that are arguably deviations are not significant, do not degrade the chain of custody and do not undermine confidence in the test results. For example, the record reflects that the labels were filled in before being affixed to the bottle, not after as the Order prescribes. This understandable deviation (it is manifestly easier to write on a flat surface than on the curved surface of a sample bottle) is entirely insignificant to the chain of custody or reliability of results. So, too, is the failure, also understandable, to deliver the completed sample bottles to the CDAC on the day collected. The samples were locked securely in an office adjacent to the twenty-four hour watch office where individuals on watch confirmed that the office was locked. The building itself was locked, there was no evidence whatever that any attempt was made that night to tamper with the samples, and the samples were delivered to the CDAC promptly the next morning. Even assuming that next-day delivery is a deviation from the Order, the treatment accorded the samples was entirely appropriate and in no way degraded or cast doubt on the chain of custody or test results. Fall-

---

**21.** The government's expert could not completely rule out accidental ingestion because the amount of marijuana in a cigarette is roughly equivalent to that which might be baked in a cookie. Yet whether ingestion is "knowing" is a common question of fact in these cases, the answer usually turning upon the credibility of the defendant. Here, the Board did not find Andrews' denial to be credible. Moreover, Andrews offered no explanation as to how he accidentally could have eaten a marijuana-laced cookie.

**22.** This point is too well-established to admit of dispute. *See Kumferman v. Department of Navy*, 785 F.2d 286, 290 (Fed.Cir.1986); *Griessenauer v. Department of Energy*, 754 F.2d 361 (Fed.Cir.1985). Some courts have said credibility determinations are "virtually unreviewable." *Hambsch v. Department of the Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986); *see also DeSarno v. Department of Commerce*, 761 F.2d 657, 661 (Fed.Cir.1985).

**23.** They are:

1. Too many people in the rest room at one time.
2. Failure to have the coordinator initial the label after the examinee did so prior to furnishing the sample.
3. Completion of label before affixing it to sample bottle.
4. Supervisory personnel left duty station to take samples from senior staff.
5. More than one bottle was on the recording table at one time.
6. Collected samples not delivered to CDAC on the day collected.
7. Failure to provide adequate numbers of personnel to carry out sweep procedure.
8. Failure to maintain collected urine samples in a secure area.

**24.** This group of allegations includes, at least, the charges (i) that supervisory personnel left their duty stations during the test, (ii) that more than one bottle at a time was placed on the recording table, (iii) that the Recorder maintain continuous custody and control over completed samples, and (iv) failure to provide adequate numbers of personnel to conduct the test.

ing into the same category are the allegations that the testing team was understaffed, that too many were allowed in the head at the same time and that the coordinator failed to initial the label after the examinee did so. Record facts preclude any significant doubts about the integrity and reliability of the sweep procedures and test results.[25] Andrews checked and initialed the label that was then placed on his sample bottle. He then took the bottle into the head where, observed by a team member, he provided a urine sample and returned to the Recorder's table. There, the Recorder affixed an evidence label over the top of the bottle, which Andrews again checked. The bottle was then replaced in the box. Significantly, Andrews himself confirmed that he never relinquished custody of his bottle at any time between receiving it from the Recorder and returning it to the Recorder. No evidence suggests any reason to doubt that the sample provided by Andrews was not the one found by the laboratory to contain marijuana metabolites.[26] Members of the Board of Inquiry, after an exhaustive inquiry on each allega-

tion, reached the same conclusion and this Court sees no reason to upset it on any ground, including due process.[27]

■ Andrew's final contention is that the hearing Recorder, Lieutenant Colonel McCarthy, inappropriately assumed a prosecutorial role. This contention is meritless. The governing instruction, Secretary of the Navy Instruction 1920.6A, simply states that "the Convening Authority shall appoint a nonvoting Recorder to perform such duties as are appropriate."[28] In this instance, the Recorder played two roles: He acted to ensure that available evidence was presented to the Board and he consistently advocated, in argument and in questioning witnesses, the view that the evidence warrranted a finding that Andrews knowingly ingested marijuana. Both roles are "appropriate." Nowhere does any statute or regulation prohibit Recorders from playing these roles. Absent a violation of an applicable statute or regulation, Andrews has no right to relief. *See Alberico v. United States*, 783 F.2d 1024, 1028–29 (Fed.Cir.1986). Beyond this, however, the

---

**25.** Worth noting is that Sergeants Green and Estrada, members of the urinalysis sweep team, were not inexperienced. Green and Estrada performed approximately 25 and 17 such sweeps, respectively.

**26.** Major Yantorn, a participant and organizer of the urinalysis, testified that he had seen approximately thirty urinalyses conducted and the one on January 30, 1986 was "one of the best" he had seen in terms of professionalism and attention to detail. Andrews himself conceded that the testing procedures seemed fine, that he could say nothing to contradict the testimony of Sergeants Estrada and Green on how the sweep was conducted and that he could not see how anyone could have tampered with the sample.

**27.** Andrews' reliance on *United States v. Mielenz,* No. 87–3235 (N.M.C.M.R.1987) is misplaced. It is distinguishable. There, the Navy-Marine Corps Court of Military Review, in an unpublished opinion, reversed a Special Courts-Martial conviction for wrongful use of marijuana because testimony undermined the reliability of urinalysis collection procedures. The testimony of the coordinator in this instance was disputed by the accused and two disinterested witnesses. Moreover, the coordinator's testimony was not corroborated as the applicable Navy regulation required. These circumstances are sharply distinguishable from those at bar. This

is not a criminal case where the issue is guilt or innocence and the burden of proof is beyond a reasonable doubt. Nor is this a criminal case where crucial testimony on collection procedures was in conflict and where the absence of corroborative testimony on procedures violated a regulation, thereby undermining the reliability of the procedures. Instead, this is a civil case where testimony on collection procedures was uniform and confirmatory of the result. Any procedural deviations were minor and do not undermine confidence in the result. The issue in *Mielenz* was criminal guilt or innocence with criminal sanctions at stake whereas this is a civil matter where the issue, in essence, is Andrews' fitness to continue to serve as a commissioned officer in the Marine Corps.

**28.** The instruction also lists the panoply of procedural rights and safeguards afforded a respondent, all of which Andrews enjoyed.
 1. Notice and reasonable time to prepare.
 2. Representation by competent retained or appointed counsel.
 3. Opportunity to present a respondent's case.
 4. Full access to pertinent records.
 5. The right to confront and cross-examine witnesses.
 6. The right to make a sworn or unsworn statement.

*See also* 10 U.S.C. § 1185 (1983).

Courts review of the entire record discloses no conduct by the Recorder which, even if inappropriate, was fundamentally unfair or caused Andrews specific harm. The Recorder's injection of the alleged racial and sexist remarks by Andrews was appropriate rebuttal in light of Andrews' parade of character witnesses. Moreover, it is unmistakably clear from the Record that the Board was independently minded and not a group over which the Recorder held sway. Thus, Board members actively questioned witnesses called by both parties and also called and recalled its own witnesses. It also ordered a physical demonstration of the sample collection procedures used, a videotape of Sergeant Estrada's office and a demonstration concerning the evidence labels that were used to seal the bottle tops. Thus, even assuming that the Recorder acted inappropriately, the record reflects that the Board was of independent mind and was not under the Recorder's influence. It ultimately reached its conclusions based on the evidence and not because they were advocated by the Recorder. Also pertinent here is the clear record evidence that Andrews was ably and vigorously represented by competent counsel. In short, the Recorder's advocacy of discharge for Andrews was not inappropriate, not unfair, and not contrary to any statute on regulation.

### Conclusion

This is a difficult case, not because it presents complex factual or legal issues, but because Andrews' conduct, condoned in some circles, had such horrendous consequences to his apparently exemplary military career. In fact, knowing ingestion of any illicit drug should not be condoned in any circle; the scourge of drugs on our society cannot be exaggerated. The problem is especially acute in the armed services. Chief Judge Markey recorded Congress' grave concern over the use of drugs in the military. He wrote:

In 1971, [Congress] described drug abuse as "a profoundly serious national problem that is having a grave effect on the Armed Forces." Conf. Rep. No. 433, 92d Cong., 1st Sess., *reprinted at* 1971 U.S.

Code Cong. & Ad. News 1495, 1505. In 1978, the House Select Committee on Narcotics Abuse and Control found that "[d]rug abuse constitutes a significant drain upon the military in both human and monetary terms" and found a need for an investigation into "the effect of drug abuse on combat readiness." *Drug Abuse in the Armed Forces,* 95th Cong. 2d Sess. 26 (1978). Numerous hearings have been held and reports issued on drug abuse problems facing the military. Most recently, the House Select Committee concluded study missions to Hawaii, Asia, and Italy, during which it heard testimony that drug abuse impairs productivity, health, safety, and military readiness. The Committee Report specifically noted a Department of Defense study attributing a May 1981 jet crash aboard the U.S.S. NIMITZ to use of illegal drugs by the pilot and crew. [citations and footnote omitted].

\* \* \* \* \* \*

In September 1981, at hearings before a House Select Committee, outraged Members of Congress stated that the results of a recent fact-finding mission and survey of U.S. military personnel revealed "a shocking level of drug abuse" within the military. *Drug Abuse in the Military—1981 Hearing Before the Select Committee on Narcotics Abuse and Control,* 97th Cong., 1st Sess. 2 (1981) (Statement of Representative Leo Zeferetti). Members of the Select Committee found that "critical national security issues" were at stake, that because of severe drug abuse, the military could no longer ensure the combat readiness of its troops, and that the United States was faced with "a real and present danger to its security." *Id.* at 5 (Statement of Representative Benjamin Gilman).

*Williams v. Secretary of the Navy,* 787 F.2d 552, 553–54 (Fed.Cir.1986). This underscores the wisdom of limiting judicial review to the legality of administrative proceedings and of avoiding judicial evaluation of the results. The decision to discharge Andrews seemed unduly harsh to the Board and it might well seem so to this

Court as well. But the discharge decision, provided it is permitted by law, is the province of the military authorities and deserves judicial deference.[29] Again, Chief Judge Markey put this point well:

> That [judicial] deference was especially appropriate here, where the Army was determining the suitability of a commissioned officer. *Maier v. Orr,* 754 F.2d 973, 984 (Fed.Cir.1985) (fitness for duty); *see Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 539, 97 L.Ed. 842 (1953) (judges not given the task of running the Army). In *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the Supreme Court observed that "the special relationships that define military life have 'supported the military establishment's broad power to deal with its own personnel. The most obvious reason is that courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have.'" *Id.* at 305, 103 S.Ct. at 2367 (citation omitted); *see Williams v. Secretary of the Navy,* 787 F.2d 552, 560–62 (Fed.Cir.1986).

*Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986).

For all the reasons stated herein, judgment in this matter is awarded to the Secretary of the Navy. An appropriate Order will issue contemporaneously with this Memorandum Opinion.

---

**29.** Although the Court decides this matter favorably to the Secretary of the Navy and enters final judgment accordingly, the Court nonetheless directs that counsel for the Secretary of the Navy communicate to him this Court's *request* that the appropriateness of a discharge in Andrews' case be reviewed. In making this request, the Court intimates no view on the appropriateness and harshness of a discharge in this context, only a concern to insure that the matter has been thoroughly and carefully considered in light of the Board of Inquiry clemency recommendation and in light of the treatment accorded similarly situated officers. Given this decision, however, the Secretary is not *required* to take any action at all with respect to the discharge. Counsel for the Secretary is directed to report the results of the Court's request within thirty (30) days.